## Richmond

CLAUDE Z. LAMB v. COMMONWEALTH OF VIRGINIA.

September 2, 1976.

Record No. 760082.

Present, All the Justices.

*J. Wayne Sprinkle (Robert J. Sondej; Mattox, Sondej & Young,* on brief), for plaintiff in error.

*Jerry P. Slonaker, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the court.

The defendant, Claude Z. Lamb, was convicted on September 17, 1975, by the trial court, sitting without a jury, of first degree murder

and robbery. He was sentenced to life imprisonment and 20 years, respectively. On appeal, his principal contention is that a statement made by him shortly after he was taken into custody was improperly admitted in evidence because the statement was obtained in violation of his Sixth Amendment right to counsel and *Miranda* v. *Arizona*, 384 U.S. 436 (1966). We conclude the statement was properly admitted and affirm.

Viewed in a light most favorable to the Commonwealth, these are the facts as disclosed by the evidence adduced at the suppression hearing and during trial on the merits. On April 15, 1975, Olga Gustavson, who had been working alone as a saleslady at the Record Bar in Portsmouth, was found at her place of employment about 7:15 p.m. unconscious from severe blows to the head. Money and items of merchandise had been taken from the store. The victim died six days later as the result of the head injuries.

On April 25, 1975, attorney Troy Spencer of the City of Norfolk received a telephone call from the defendant about 2:15 p.m. Lamb said he was wanted in connection with the robbery of a record store and a murder in Portsmouth and desired to surrender to Detective McPhatter of the Norfolk Police Department. Lamb explained that in the past he had "a bad experience" with the Portsmouth police and he did not want to "turn himself in" to the Portsmouth police in Portsmouth but to McPhatter in Norfolk, whom he knew. Spencer called McPhatter, explained "the situation," and asked him to "stand by". Spencer tried unsuccessfully to reach James A. Cales, Commonwealth's Attorney of Portsmouth, although he reached one of Cales' assistants who alerted Portsmouth Detective Ewing. About 15 minutes after the first conversation, Lamb called Spencer again. Spencer told Lamb he had reached McPhatter but not Cales and suggested Lamb come to Spencer's office. About 15 minutes thereafter, Lamb arrived.

Spencer then reached Cales by telephone and, in Lamb's presence, told Cales he was representing Lamb, that Lamb wanted to surrender in Norfolk to the Portsmouth police, and "that Mr. Lamb did not want to make any statements and I [Spencer] didn't want him questioned." Cales said he could not promise there would be no questioning and that Spencer would have to discuss the matter with the Portsmouth detectives who picked up Lamb. Cales stated to Spencer he "thought the police would have to question him, ask him certain questions."

Shortly thereafter, about 3:00 p.m., Spencer and Lamb arrived at Detective McPhatter's office at the Norfolk Detective Bureau; Ports-

mouth Detectives Ewing and Harvey had already arrived. Spencer took Ewing and Harvey into a separate room and told them he was Lamb's attorney, that he did not want Lamb questioned and that Lamb did not want to be questioned. Ewing replied that they "were going to talk to him once [they] got him back to headquarters." Spencer then asked Ewing "not to be hard on him", "not [to] question him too long", and "[to] make it perfunctory". When the three returned to McPhatter's office, Spencer told the defendant, "Remember, Lamb, make no statement whatsoever." The three detectives and the defendant then left for Portsmouth and Spencer returned to his office.

On the way to Portsmouth the detectives did not ask Lamb any questions or interrogate him in any way. When they arrived in Portsmouth at 3:20 p.m. McPhatter returned to Norfolk and Ewing and Harvey took Lamb to the Detective Bureau. Ewing told Lamb that he was to be questioned about the Gustavson murder and the robbery but that before Lamb "said anything" he wanted to advise Lamb of his rights. When Ewing informed the defendant that he had the right to remain silent Lamb interrupted and said, "I know that; Mr. Spencer said I didn't have to say anything. . . . Every time I give a statement to anyone it gets screwed around with a different meaning." Ewing then told the defendant that if he gave a statement he would see that Lamb got a copy of it so "it couldn't get twisted around." Ewing then finished reading Lamb his *Miranda* rights and allowed the defendant to read the rights waiver form, after which Lamb signed the form and gave the statement in issue admitting the crimes, signing the statement after it had been reduced to writing. After giving the statement, the defendant offered to take the detectives to the scene of the crimes. The questioning of Lamb began at approximately 3:30 p.m. and Ewing finished taking the statement at 4:00 p.m.

Ewing testified the defendant neither asked to talk to Spencer nor said he did not want to give a statement. Lamb admitted signing a rights waiver form and the statement but said he did not read either one. He further testified he asked to see his lawyer at least seven times during the questioning and that he gave the statement because he was scared, but admitted that he was not threatened or coerced in any way.

After the suppression hearing held about a month prior to trial, the court below decided the defendant had made "an intelligent and voluntary waiver of his rights," and the confession was later admitted into evidence at trial.

Defendant's contention that his statement should have been excluded has two primary bases. First, he argues the statement was taken

in violation of his Sixth Amendment right to counsel which he contends was not waived. Secondly, he argues the statement was taken in violation of *Miranda* because he expressed to the detectives a desire to remain silent when he said his past statements had been "screwed around with a different meaning." We reject each of these contentions.

To protect Lamb's Fifth Amendment privilege against self-incrimination, his right to counsel, of course, attached when he was taken into custody in the Norfolk Police Station, *Escobedo* v. *Illinois*, 378 U.S. 478 (1964); and at that time the police were required to advise Lamb of his rights before any interrogation. *Miranda, supra.*

■ In defendant's first argument, he contends the conduct of the detectives "was tantamount to denying [him] assistance of his counsel during interrogation." He cites a line of New York cases in support of this argument and urges us to adopt the New York rule, which is: "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel." *People* v. *Arthur*, 22 N.Y.2d 325, 329, 292 N.Y.S.2d 663, 666, 239 N.E.2d 537, 539 (1968). New York has explicitly stated, however, that this rule is based on the New York Constitution and various state statutory provisions and extends constitutional protections of a defendant beyond those afforded by the federal constitution. *People* v. *Hobson*, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976); *People* v. *Donovan*, 13 N.Y.2d 148, 151, 243 N.Y.S.2d 841, 842-43, 193 N.E.2d 628, 629 (1963).

The Supreme Court has not gone so far and we refuse the defendant's invitation to adopt a rule similar to New York's. Accordingly, we hold the police may question an accused who has counsel, retained or appointed, whether or not the attorney is present, if there is an affirmative waiver by the accused of his right to counsel made voluntarily, knowingly and intelligently. *Skinner* v. *Commonwealth*, 212 Va. 260, 263, 183 S.E.2d 725, 728 (1971); *Jordan* v. *United States*, 421 F.2d 493, 497 (9th Cir. 1970); *Coughlan* v. *United States*, 391 F.2d 371, 372 (9th Cir.), *cert. denied*, 393 U.S. 870 (1968). The question then in this case becomes whether Lamb voluntarily, knowingly and intelligently waived his right to have Spencer present during the interrogation. At the outset, it is to be remembered this right is the defendant's right and not the right of defendant's counsel, for defendant dwells here on the contention Spencer never explicitly consented to defendant's waiver of his right to counsel.

■ The Supreme Court stated in *Miranda* "a heavy burden rests

on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475. *See Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938); *Skinner, supra*, 212 Va. at 263, 183 S.E.2d at 728. We think the Commonwealth carried the "heavy burden" in this case. In the first place, there is no indication the defendant was of low intelligence, *cf. Cooper* v. *Commonwealth*, 205 Va. 883, 891, 140 S.E.2d 688, 694 (1965); indeed, he took the precaution of seeking the aid of an attorney before surrendering to the police, with whom he apparently had prior experience. Moreover, Lamb was repeatedly notified of his right to counsel. The evidence shows Spencer informed defendant of all of his rights. The detectives, too, advised the defendant of these rights and the trial judge found as a fact the defendant read both the waiver form and the statement before signing each. The waiver form contained the question: "Do you understand that you have a right to talk to a lawyer and to have the lawyer present during all questioning, if you so desire?" The defendant's own testimony shows that there was no overbearing conduct or deceitful practices on the part of the detectives. *See Land* v. *Commonwealth*, 211 Va. 223, 229, 176 S.E.2d 586, 590 (1970). The whole process took less than half an hour. There is not the slightest indication in the evidence that Spencer asked to come to Portsmouth or that he was ever refused the opportunity of being present. The trial judge also found as a fact the defendant did not seek Spencer's presence during the interrogation. Indeed, after the statement was signed, defendant offered to conduct the police on a tour of the scene of the crimes—hardly the reaction of one who was allegedly coerced during the interrogation. In sum, the evidence of knowing and intelligent waiver by the independent conduct of the accused acting contrary to counsel's instructions, which he had a perfect right to do, is overwhelming.*

▮ The defendant's second argument, that the statement was taken in violation of *Miranda*, is based on the contention that his right to remain silent was violated because the detectives did not "scrupu-

---

*The defendant relies heavily on *Williams* v. *Brewer*, 509 F.2d 227 (8th Cir. 1974), *cert. granted*, 423 U.S. 1031 in support of his argument that he was denied the assistance of counsel. Besides many factual differences, the record there disclosed "no facts to support the conclusion of the state court that appellee had waived his constitutional rights other than that appellee had made incriminating statements." 509 F.2d at 233. Such is not the case here. Furthermore, that case does not stand for the proposition that once a defendant has an attorney he cannot waive his right to remain silent unless the attorney is present.

lously honor" his desire not to give a statement. He quotes from *Miranda* in which the Supreme Court stated that "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. at 445. He contends that his reply to the detectives that "[e]very time I give a statement to anyone it gets screwed around with a different meaning" was an attempt to end the interrogation.

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975). But *Miranda* should not be read so strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning. We are of opinion the defendant's reply in this case should not have been interpreted as an attempt to end the interrogation. Lamb merely expressed a reservation about giving a statement, based on past experience of having other statements misunderstood or misinterpreted. Upon being promised a verbatim copy, his concern was allayed. *See Akers* v. *Commonwealth*, 216 Va. 40, 46, 216 S.E.2d 28, 31-32 (1975). And even if we assume Lamb's remark was an attempt to cut off questioning, we cannot say that because the police merely asked the defendant whether he would give a statement if they promised to give him a typed copy, they did not "scrupulously honor" his right to cut off questioning. Their proffer of a copy was a logical and proper reaction to Lamb's comment.

Having determined the confession was properly admitted, defendant's contention the evidence was insufficient to convict is wholly without merit.

For these reasons, the judgments of conviction are

*Affirmed.*