COURT OF APPEALS OF VIRGINIA


Present: Judges Coleman, Annunziata and Bumgardner
Argued at Norfolk, Virginia


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
v.    Record No. 2204-98-1    JUDGE ROSEMARIE ANNUNZIATA
APRIL 19, 1999
JIMMY WILLIAMS


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Marc Jacobson, Judge

H. Elizabeth Shaffer, Assistant Attorney
General (Mark L. Earley, Attorney General,
on briefs), for appellant.

B. Thomas Reed (Joseph C. Lindsey, on
brief), for appellee.


On January 7, 1998, Jimmy Williams ("the defendant") was indicted for capital murder and two counts of using a firearm in the commission of murder. On April 24, 1998, the defendant filed a motion to suppress a statement he gave to officers of the Norfolk Police Department. The statement inculpated Kelvin Hudson, the defendant's brother and codefendant. The trial court granted the suppression motion, finding that the statement was "constitutionally invalid." The Commonwealth appeals this decision, asserting the defendant voluntarily waived his Fifth

---

[*]Pursuant to Code § 17.1-413, recodifying Code § 17-116.010, this opinion is not designated for publication.

Amendment constitutional rights.  We agree and reverse the trial court's decision to suppress the defendant's statement.

I.

FACTUAL BACKGROUND

On September 16, 1997, Demetrius Ray Wiley, William Spencer, and Terry Chark were murdered in Norfolk. Subsequently, juvenile petitions were issued against the defendant for the murders.  Detective David Newman arrested the defendant and brought him to the Police Operations Center ("POC") in Norfolk, where Newman and another detective attempted to interview him about the murders.  After advising the defendant of his Miranda rights, however, the defendant declined to speak with the detectives, and the detectives ceased questioning him.

At some point after the defendant's preliminary hearing in December 1997, while he was being held at the Norfolk City Jail, the defendant told Jennell Jackson, his sister, that he wanted to talk to the police about the murders.[1]  The defendant also asked his mother, Davelyn Ann Williams, to tell his lawyer, Danny Shipley, that he wanted to speak with him about the murders.  In response, Williams and Jackson went to Shipley's office and informed him of the defendant's requests.  Shipley

---

[1]Even before his arrest, the defendant told Jackson that their brother, Kelvin Hudson, had killed Terry Chark, another brother, and that he wanted to give this information to police.

informed them that he would arrange for an interview with police so that the defendant could give a statement.  Because of his concerns regarding the defendant's ability to communicate, however, Shipley told Williams and Jackson that he wanted to be present during the interview and told them to likewise be present.

On March 3, 1998, Williams and Jackson also contacted Newman at his home and asked to speak with him at the POC.  When Newman met with Williams and Jackson, they informed the officer the defendant wanted to speak with him, summarizing what the defendant would say.

On March 4 or 5, 1998, Shipley spoke with Norman Thomas, Deputy Commonwealth's Attorney, and scheduled a meeting between the defendant and police at the POC for Monday, March 9, 1998.  During their conversation, Shipley informed Thomas that he "thought it would be best for [the defendant's] mother [and him] to be there" because of the defendant's "inability to communicate very well."

On Friday evening, March 6, 1998, Shipley realized that he had a previous engagement that precluded him from attending the March 9 meeting with police.  On the morning of March 9, Shipley left a message at Thomas' office, informing Thomas that he could not attend the meeting and asking that the meeting be rescheduled.  Shipley and Thomas continued to exchange messages for the remainder of the day, never successfully speaking to one

another in person.  At one point, Thomas left a message for Shipley inquiring whether the police could conduct the interview as scheduled if the defendant's family was present, since there was no legal requirement that counsel be present.  Shipley returned the message on Thomas' voice mail, stating that he wanted the meeting to be rescheduled so that he could attend. Shipley never indicated the defendant did not want to speak with the police.

After consulting with Thomas as to the legality of carrying out their prearranged meeting with the defendant despite the absence of counsel, the police contacted Williams and Jackson and arranged for them to meet the defendant at the POC.  Newman explained that Shipley would not be present at the interview, but that the defendant could carry on without the presence of counsel if he was willing to do so.  As previously arranged, the police transported the defendant from the Norfolk City Jail to the POC.  Williams and Jackson were present when the defendant arrived at 5:30 p.m.  Newman and another detective began speaking with the defendant, Williams, and Jackson at approximately 5:50 p.m. regarding whether to go forward with the interview without Shipley.  Williams and Jackson remained with the defendant throughout his meeting with the detectives.

At the defendant's suppression hearing, three witnesses testified the defendant wanted to speak with the police on March 9, 1998 notwithstanding Shipley's absence.  Jackson testified:

Q. Did you learn that Jimmy's attorney could not [meet at the POC that day]?
A. When we got there, he said he couldn't go. We talked to his secretary earlier that day and he wasn't coming there.
Q. And did you understand that he wanted to postpone that meeting?
A. Yes.
Q. During that period of time, did Jimmy still want to talk to the police?
A. Yes.
Q. Did Jimmy want to talk to the police even though his attorney couldn't be there and wanted to postpone.
A. From my understanding, yes.
Q. And is that from talking to Jimmy?
A. Yes.

Williams testified in pertinent part:

Q. So someone told you that [Shipley] didn't have to be there?
A. Yes.
Q. Were you ever told that [Shipley] wanted to be there and wanted to reschedule?
A. Yes.
Q. Who told you that?
A. [Shipley's] secretary and also the [sic] Detective Newman said that [Shipley] wanted to reschedule it.

          *    *    *    *    *    *    *

Q. At any time you were with [the defendant] that night, did you get the impression he did not want to talk to the police or did you get the impression that he wanted to talk to the police?
A. I got the impression that he wanted to because he thought it was the right thing. That's the impression I got.

Officer Newman also testified the defendant wished to speak with

the police:

Q. Did [Williams and Jackson] give you affirmative statements that [the defendant] wanted to talk to you?

A.  Yes, they did.

Q.  Did you receive some word about defense counsel, Mr. Shipley, not being available?

A.  Yes.  Dee Williams, the mother of Jimmy Williams advised me that she was to understand that the meeting was to be continued and that she was frustrated; that she said that she waited too long and that Jimmy was getting upset, wanting to talk to us regardless of whether he was present or not; if we could go ahead and still have the meeting and go ahead that day, which is what we went ahead and arranged.

Q.  Did you have discussions with [Williams and Jackson] about whether to go forward or whether to postpone so that defense counsel could be there?

A.  Yes, I did [and they wished to go forward].

            *   *   *   *   *   *   *

Q.  What about with [the defendant]?

A.  He wished the same.  When he was brought in and I initially set him down and I advised him and made him aware that he was represented by Mr. Shipley, that he was not required to make any statement to me or talk to me; that if he wanted to, it would have to be because he, in fact, wanted to and that he had the option to have Mr. Shipley present or not present and that was up to him, and it was his desire at that time that he expressed he wanted to talk to me without Mr. Shipley present.

    After ascertaining the defendant wanted to make a statement, Newman read the defendant his <u>Miranda</u> rights using the Norfolk Police Department Legal Rights Advice Form.  Newman invited both the defendant and his mother to ask him any questions regarding these rights as he read them.  After reading that the defendant had the right to have counsel present "during all questioning," Newman directly asked the defendant if he

wanted to continue with the interview.  The defendant replied

affirmatively.  The defendant also read the form himself and

indicated that he understood his rights by writing "yes"

together with his initials next to each sentence outlining his

rights.  The defendant signed the form, while Officer Newman and

Williams signed as witnesses.  Jackson testified that this

process took a "long time," during which no one pressured the

defendant to act more quickly.

After completing the Legal Rights Advice Form, Newman and

the defendant discussed the present offenses without recording

the conversation.  Newman subsequently took a recorded statement

from the defendant, which the Commonwealth proffered as Exhibit

Number 1 at the suppression hearing.  At the beginning of this

statement, the defendant acknowledged that he understood his

rights as set forth in the Legal Rights Advice Form and,

particularly, that he understood he had the right to have

Shipley present during the interview.  Nonetheless, the

defendant stated that he desired to speak with the police

notwithstanding Shipley's absence and proceeded to tell police

about the circumstances surrounding the murders of Wiley,

Spencer, and Chark, answering all questions asked by the

officers as he did so.[2]

---

[2]Specifically, the defendant described an incident in which
he, Terry Chark, Kelvin Hudson, and two companions became
involved in a gunfight with several other individuals, with whom
Hudson had an earlier argument.  According to the defendant,

After completing the statement, Newman reviewed it with the defendant and his mother, allowing them to read one page at a time. The defendant indicated that he could read and write; Williams agreed, though cautioning that the defendant was "a little slow" and required extra time to go through the statement.[3] Whenever Newman saw a discrepancy in the statement, he would point it out to the defendant and have the defendant clarify his meaning. Newman then made any necessary correction and initialed it. After reviewing a page of his statement, the defendant initialed the top and bottom of each page. Newman testified that the defendant's review of his statement was "a time-consuming process," in which they "took each page one by one and made sure everything was correct." Newman further testified the defendant's answers to the recorded statement were substantially similar to those given during their earlier

Hudson forced him to go to the fight, striking him in the head several times when he protested. Each individual, including the defendant, possessed a gun during the altercation. The defendant stated that Hudson, his codefendant, shot Chark during the gunfight. After the shooting, Hudson told the defendant to "keep [his] mouth shut." The defendant stated that, although he fired his gun twice into the ground during the fight, he did not shoot anyone.

[3]At that time, the defendant was sixteen years old. The defendant regularly attended Norview High School where he took special education classes. The defendant did not comprehend as quickly as "normal children" and required additional explanation, time, and patience to achieve understanding. The defendant could write, read "a little bit," and do basic mathematics, such as adding and subtracting. The defendant received nearly $500 a month from SSI, which one of his sisters helped him save. When shopping, the defendant was capable of choosing what he wanted for himself. The defendant also knew how to drive a car.

unrecorded discussion.  At one point, the police interrupted the interview so that Williams could leave and get the defendant something to eat.  During this time, the defendant was allowed to "visit" with Jackson and "collect his thoughts."  The defendant did not ask the police any questions during the interview.

In determining that the defendant's statement was "constitutionally invalid" and granting the motion to suppress, the court cited as grounds the following:  1) admissions by juveniles require special precautions to ensure they were not involuntary; 2) the defendant's diminished mental capabilities and inexperience with the criminal justice system; 3) the defendant, his mother, or his sister had never been advised that Shipley specifically requested and wished to be present when the defendant spoke to the police; and 4) Shipley "specifically and affirmatively indicated that he desired, intended and expected to be present at and for any statement given by Williams to the police and was under the impression that such would be the case."

## II.

## LEGAL PRINCIPLES

"'In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present

during interrogation.'" Grogg v. Commonwealth, 6 Va. App. 598, 611, 371 S.E.2d 549, 555 (1988) (quoting Fare v. Michael C., 442 U.S. 707, 717 (1979)). An accused may waive his constitutional right to remain silent and to the presence of an attorney provided the waiver is made voluntarily, knowingly, and intelligently. See Skinner v. Commonwealth, 212 Va. 260, 263, 183 S.E.2d 725, 728 (1971); Roberts v. Commonwealth, 18 Va. App. 554, 557, 445 S.E.2d 709, 711 (1994). An accused may waive the presence of his or her attorney after one has been appointed or retained, even though the attorney has instructed the accused to remain silent. See Lamb v. Commonwealth, 217 Va. 307, 310, 227 S.E.2d 737, 740 (1976); Skinner, 212 Va. at 263, 183 S.E.2d at 728.

In determining whether a waiver was voluntary, knowing, and intelligent, the court must examine the totality of circumstances surrounding the interrogation. See Fare, 442 U.S. at 717. The court's task is to determine whether the accused's statement "'is the product of an essentially free and unconstrained choice . . . or whether the maker's will has been overborne and his capacity for self-determination critically impaired.'" Roberts, 18 Va. App. at 557, 445 S.E.2d at 711 (quoting Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381, cert. denied, 469 U.S. 873 (1984)). When a juvenile is the subject of interrogation, "'the greatest care must be taken to assure that the admission was voluntary, in the sense

not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.'"  Grogg, 6 Va. App. at 612-13, 371 S.E.2d at 556 (quoting In re Gault, 387 U.S. 1, 55 (1967)). Relevant considerations include an "'evaluation of the juvenile's age, experience, education, background and intelligence, and into whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights and the consequences of waiving those rights.'"  Roberts, 18 Va. App. at 557, 445 S.E.2d at 711 (quoting Fare, 442 U.S. at 725).  The presence of a parent, guardian, independent interested adult, or counsel is a factor that weighs in favor of finding that a juvenile's waiver of constitutional rights was knowing and intelligent.  See Grogg, 6 Va. App. at 613, 371 S.E.2d at 557.  The manner in which interrogating officials conducted the interview, including the presence of coercion, deceit, or trickery, is also a relevant consideration.  See Akers v. Commonwealth, 216 Va. 40, 46, 216 S.E.2d 28, 32 (1975). The burden of proving a waiver of constitutional rights rests with the government.  See Lamb, 217 Va. at 310-11, 227 S.E.2d at 740.  The trial court's finding that a defendant has executed a valid waiver will not be reversed if supported by substantial and credible evidence.  See Terrell v. Commonwealth, 12 Va. App. 285, 290, 403 S.E.2d 387, 389 (1991); Goodwin v. Commonwealth, 3 Va. App. 249, 253, 257, 349 S.E.2d 161, 163, 165-66 (1986).

Examining the totality of circumstances in this case, we do not find substantial and credible evidence to support the conclusion that the defendant's statement was taken in violation of the Fifth Amendment. Rather, the evidence supports the obverse, showing clearly that the defendant understood his Fifth Amendment rights and waived his rights voluntarily, knowingly, and intelligently.

Defendant was not unfamiliar with his rights under the Fifth Amendment when he executed the waiver of those rights and gave his statement to the police. When defendant was first arrested, he was advised of his rights before police attempted to interrogate him. At that time, the defendant did not invoke his right to counsel but he exercised his right to remain silent and declined to speak with the police. See Roberts, 18 Va. App. at 558, 445 S.E.2d at 711 (finding that the defendant's prior exercise of his right to remain silent indicated that he was familiar with his Fifth Amendment rights).

Several months later, after his preliminary hearing, the defendant initiated contact with the police by telling his mother and sister that he wished to speak with the police about the deaths of Wiley, Spencer, and Chark. In compliance with the defendant's request, Shipley, his attorney, arranged for a meeting with police at the POC.

Although Shipley later discovered that he could not attend the meeting and attempted to have it rescheduled, Shipley's

insistence that the defendant not speak to police outside his presence did not impair the defendant's ability to validly waive his Fifth Amendment rights.  See Lamb, 217 Va. at 310, 227 S.E.2d at 740 ("[I]t is to be remembered [the right to counsel during interrogation] is the defendant's right and not the right of defendant's counsel, for defendant dwells here on the contention [that his attorney] never explicitly consented to defendant's waiver of his right to counsel.").  Because only the defendant could have exercised his Fifth Amendment rights, the trial court's finding that Shipley "specifically and affirmatively indicated that he desired, intended and expected to be present" during the defendant's interrogation is without legal import and offers no support for the court's conclusion that the defendant's statement was taken in violation of the Fifth Amendment.

Furthermore, the defendant's knowledge of Shipley's desire to be present during any interrogation is irrelevant to the validity of his waiver of Fifth Amendment rights.  Even when police intentionally withhold from a defendant information regarding counsel's availability or counsel's attempt to communicate with the defendant, "such conduct is only relevant to the constitutional validity of a waiver [of Fifth Amendment rights] if it deprives [the] defendant of knowledge essential" to an understanding of the nature of his or her rights and the consequences of abandoning them.  Moran v. Burbine, 475 U.S.

412, 423-24 (1986). In this case, the evidence demonstrates that the defendant chose to speak to the police with full awareness of his rights and of the consequences of waiver. Thus, Shipley's request to reschedule the interrogation had no bearing on the defendant's "capacity to comprehend and knowingly relinquish" his constitutional rights. Id. at 422.

Moreover, even were the defendant's knowledge of Shipley's desire to reschedule the interrogation relevant to the issue, the trial court's finding that the defendant and his relatives were not told of Shipley's desire is plainly wrong. See Naulty v. Commonwealth, 2 Va. App. 523, 527, 346 S.E.2d 540, 542 (1986). According to both Jackson and Williams, when they met with Shipley at his office to inform him of the defendant's request to speak with the police, Shipley stated that he would arrange for an interview and, because of his concerns regarding the defendant's inability to communicate, wanted to be present during the interview. On the day of the interview, Williams and Jackson were again reminded that Shipley did not want the defendant to speak to police outside of his presence. Williams testified that she spoke with Shipley's secretary and Detective Newman, who both informed her that Shipley could not attend the interview and desired to have it rescheduled. Jackson testified that, on the day of the interview, she knew Shipley wanted to reschedule and, notwithstanding Shipley's desire to postpone the interview, the defendant wanted to speak with police. Thus, it

is evident from the record that the defendant waived his right to have his attorney present during the police interview after he was made aware that his attorney could not be present and wished to have the interview postponed.

The remaining circumstances surrounding the defendant's statement also fail to support the conclusion that the defendant's will had been overborne and his capacity for self-determination critically impaired when he gave his statement to police. Indeed, although the trial court correctly noted that special precautions should be taken in order to ensure a juvenile executes a voluntary, knowing, and intelligent waiver of constitutional rights, particularly in light of the testimony in this case regarding the defendant's mental abilities, the evidence shows that the police, in fact, took extra precautions.

Before commencing the March 9 interview, police contacted the defendant's mother and sister, arranging for them to meet the defendant at the POC. These family members arrived at the POC before the defendant and remained with the defendant throughout the interview. Both Williams and Jackson were informed that Shipley wanted to reschedule the interview and discussed with the defendant whether he should go forward notwithstanding the absence of counsel. Williams and Jackson were present when the police informed the defendant of his rights, when the defendant indicated he understood those rights,

and when the defendant expressed his desire to speak with police notwithstanding his right not to do so.  Both Williams and Jackson testified that the defendant desired to speak with police on the occasion in question.

As to the conditions of the interview, there is no evidence that the police obtained the defendant's waiver by coercion, deceit, or trickery.  On the contrary, the defendant was not threatened in any way during the interview and was allowed to review the Legal Rights Advice Form without pressure.  Moreover, the police interrupted the interview so that Williams could obtain something for the defendant to eat, during which time the defendant was allowed to visit with Jackson and collect his thoughts.

The evidence likewise fails to establish that the defendant was mentally incapable of understanding and intelligently deciding to waive his constitutional rights.  While the evidence shows the defendant did not have the capacity to understand his options or review written documents quickly, the defendant was afforded ample time and assistance to assure his comprehension. Furthermore, the defendant indicated that he understood his rights both orally, after Detective Newman read the Legal Rights Advice Form, and in writing, by filling out the form.  The defendant reviewed the form with the assistance of Detective Newman and his mother, taking a "long time" to read his rights and place his initials next to each written articulation of the

rights.  At the beginning of the defendant's recorded statement, the defendant again indicated that he understood his rights, particularly the right to have his attorney present during the interview.  The defendant reiterated that he wished to speak with police notwithstanding his attorney's absence.  After completing the recorded statement, the defendant reviewed the document, one page at a time with the assistance of his mother, initialing the top and bottom of every page.  Whenever Newman noticed a discrepancy, the defendant was asked to clarify his meaning, and did so.

In short, the record fails to show that the defendant did not make a voluntary, knowing, and intelligent waiver of his Fifth Amendment rights before making the statement at issue and fails to reflect substantial and credible evidence in support of the trial court's decision.

For the foregoing reasons, we reverse the court's suppression of the defendant's statement and remand for further proceedings consistent with this decision.

<u>Reversed and remanded.</u>