COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Haley
Argued at Salem, Virginia


ENGRAM MacSHANNON BELLAMY, A/K/A
 ENGRA MACHAN BELLAMY

                                                        MEMORANDUM OPINION* BY
v.        Record No. 3189-03-3                          JUDGE JAMES W. BENTON, JR.
                                                             JULY 5, 2005

COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF WAYNESBORO
                          Humes J. Franklin, Jr., Judge

          Michael J. Hallahan, II, for appellant.

          Donald E. Jeffrey, III, Assistant Attorney General (Jerry W. Kilgore,
          Attorney General, on brief), for appellee.


        After a grand jury indicted Engram M. Bellamy for rape and while he was in custody at the

jail, the police took him to a hospital for treatment for asthma.  A police officer who was guarding

Bellamy at the hospital engaged him in conversation while she was wearing a hidden recording

device.  At trial over Bellamy's objection, the Commonwealth introduced these inculpatory

statements in its case-in-chief.  Bellamy appeals the trial judge's ruling admitting these

statements and contends the statements were taken in violation of the Fifth and Sixth

Amendments right to counsel.  For the reasons that follow, we agree that a Sixth Amendment

violation occurred and reverse his conviction.

                                             I.

        The evidence at the suppression hearing proved that on August 11, 2002 police officers

arrested Bellamy on a charge of raping a woman who was visiting him at his residence.  A week

_____
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

later, Officers Uzdanovics and Luzader interviewed Bellamy at the jail after reading him Miranda rights. Officer Uzdanovics said this was the last of four formal interviews he had with Bellamy. When Officer Luzader confronted Bellamy with inconsistencies from their previous interviews, "Bellamy became enraged, . . . got up out of his seat, and said, 'I don't want to talk to you anymore,' and then yelled for the guard." After Officer Luzader and Bellamy engaged in more verbal exchanges, the interview ended. Several days later, when executing a search warrant to obtain Bellamy's DNA, Officer Uzdanovics "apologized . . . for Detective Luzader's behavior." Officer Uzdanovics testified that he assumed Bellamy had an attorney, but that Bellamy did not say he was represented by an attorney and did not indicate he did not want to talk.

On November 12, 2002, the grand jury indicted Bellamy for rape. Three months later, while Bellamy was still in custody, police officers transported Bellamy to a local hospital to obtain treatment for a severe asthma condition, and they guarded Bellamy during his stay. On the evening of February 11, Officer Alyssa Campbell, the officer then guarding Bellamy, engaged him in conversation for four hours about his case and other general matters. Bellamy's attorney was not present. Officer Campbell did not inform Bellamy of his Miranda rights that evening and testified she did not have any intention of interrogating Bellamy.

After learning that Officer Campbell had established a rapport with Bellamy, Officer Uzdanovics briefed her about the case and sent her to the hospital the next night with a hidden recording device. When cross-examining Officer Uzdanovics about the motive for sending Officer Campbell to guard Bellamy, Bellamy's attorney asked:

> Q: . . . she was going to ask him questions about the charge that he was under indictment for; isn't that correct?"
> A: Correct.

Q: . . . her goal was to elicit from him either incriminating statements or inconsistent statements as to this event; isn't that correct?

A: What - her role was to see what he would say about his case.

* * * * * * *

Q: In . . . Officer Campbell's interview of Mr. Bellamy, she asks him questions about the events on August 10th, 2002, involving [the complainant]; is that correct?

A: Correct.

The recording of the conversation between Bellamy and Officer Campbell that night was transcribed. Officer Uzdanovics testified as follows about the recording:

Q: Did you hear whether or not Officer Campbell Mirandized Mr. Engram when - Mr. Bellamy, when she went in there?

A: Correct. I did. We were having problems with the disc that records the digital voice. This is like the second interview we . . . We - we need to get it fixed - where there's gaps where the decibels will drop down, and it's very hard to hear. But if you turn the volume all the way up, and you spike the equalizer all the way, you can barely make out what is being said on the tape.

Q: Is that why you brought that today, so that the - the Miranda can be heard by the Court?

A: Correct.

Q: And is the Miranda listed in the actual transcript that's been turned in to evidence?

A: The first beginning stage of it, where I believe Officer Campbell says, "Well, I have to read you Miranda." And then after that - sometime after that, the decibels just dropped, and there's inaudible comments.

Q: And in - anywhere in this transcript, does Mr. Bellamy say that he wants a lawyer?

A: No.

Officer Uzdanovics did not testify about the details of the Miranda warning he heard on the recording; however, the transcription of the recording was put in the record. The first two pages of the one hundred pages of the transcript are as follows:

- 3 -

Interview by Officer Alyssa M. Campbell:

[Campbell]:  Q:  Hey, bud.

[Bellamy]:  A:  Hey.

Q:  What a pleasant surprise.  How are you?

A:  How you doing?

Q:  How are you?

A:  I'm all right.  How are you?

Q:  I'm doing pretty good.

A:  What's the weather like?

Q:  Huh?

A:  What's the weather like?

Q:  The weather?  It's cold as hell.

A:  (Inaudible comments.)

Q:  No, it's not - it's not snowing.  They're calling for snow this weekend.

A:  That's what . . . (inaudible comments) . . . just told me.

Q:  Yeah.  It's windy.  Windy.  Can you hear it in here?

A:  No.  I was looking out today and I saw the trees . . .

Q:  Yeah.

A:  . . . Back and forth all day.

Q:  Yeah.

A:  (Inaudible comments.)

Q:  Yeah.  It's cold.

A:  Is it?

Q:  Very.  Yeah.  How you been feeling?

A:  I'm feeling just great.  I've been getting these specimens out of my lungs.

Q: You sound better.

A: And I - these specimens been coming up out of my lungs.

Q: Oh, gross. I don't want to see that.

A: Anyways, so they can pretty much tell what the problem is.

Q: Right. I got bitched out because of you.

A: From who?

Q: No, I got in trouble because we were talking last night and I was being all personal with you.

A: Who told them that we were being personal?

Q: Who knows? I don't know. I didn't read you Miranda. It's like, who cares?

A: Nobody do.

Q: Who knows?

(Inaudible comments.) (Pause.)

Q: For you?

A: Yeah.

Q: I figured you were talking philosophy with everybody and they decided to give you a party so you'd shut up.

A: No. But they come in here with that mask on. I'm still talking . . . (inaudible comments).

At no other place in the one hundred pages of transcription is Miranda mentioned or were Miranda-type warnings given. The transcript of the ensuing conversation covers discussions about cute nurses, the weather, whether Bellamy was "gay," trips to the Bahamas, the medical treatment Bellamy was receiving, Bellamy's new attorney, and resorts and camping experiences. Interspersed in these rambling, casual conversations are Officer Campbell's questions about the facts of the events that led to the indictment and about Bellamy's inconsistencies.

At one point, Officer Campbell tells Bellamy she is a "new cop" and "sneaked a peek at some of the reports" about his offenses. As the conversation proceeds, Officer Campbell tells Bellamy "you definitely learned who you can trust and who you can't trust," and she suggests, "You ought to -- when you get out and after you go to the Bahamas, you ought to become a cop." Throughout their conversations about matters unrelated to the case, Officer Campbell returns to the circumstances of the rape case and questions Bellamy about inconsistencies. Bellamy made significant inculpatory statements during the discussions.

Bellamy's attorney moved to suppress the statements he made to Officer Campbell, alleging they were taken in violation of Bellamy's rights under the Fifth, Sixth, and Fourteenth Amendments. The motion alleges that when the officer questioned Bellamy she had actual knowledge of Bellamy's arrest and indictment and of the appointment of his attorney. The prosecutor argued that Bellamy never made a clear invocation of a right to an attorney under the Fifth Amendment and that "the Sixth Amendment [waiver] can be made as long as it is shown to be voluntary and . . . the warnings were given." Citing Lamb v. Commonwealth, 217 Va. 307, 310, 227 S.E.2d 737, 740 (1976), he argued that the evidence proved "an affirmative waiver . . . of his right to counsel, made voluntarily, knowingly, and intelligently." Bellamy's trial attorney argued that Bellamy clearly told the officers on August 19 that he did not want to talk to the police, that the officer's conversation with him in the hospital was "subtle" interrogation, and that the hospital conversation violated his earlier direction that he did not want to talk. The trial judge ruled that Bellamy's statements were admissible, citing Eaton v. Commonwealth, 240 Va. 236, 249, 397 S.E.2d 385, 393 (1990). In doing so, the trial judge did not elaborate on his findings but did say Bellamy never made a "specific request" and did not make a "re-assertion" of a right to counsel.

At trial, the complainant testified that she was starting to become friends with Bellamy when she went to his house for the first time to have pizza and beer. After they went to a store to purchase more beer, they returned to Bellamy's house, where he later raped her. Officer Uzdanovics testified that he interviewed Bellamy on four occasions, that Bellamy made inconsistent statements, but that Bellamy consistently said he had consensual sex with the complainant. In addition, Officer Campbell testified about inconsistent and inculpatory statements Bellamy made while in the hospital. Officer Campbell also testified she "Mirandized" Bellamy when she "walked in." At the conclusion of all the evidence, the jury convicted Bellamy of rape.

II.

Bellamy contends Officer Campbell obtained his statements in violation of his Fifth and Sixth Amendments right to counsel. The Commonwealth contends the trial judge did not err in ruling otherwise. We agree with Bellamy that the evidence proved a violation of his Sixth Amendment rights.[1]

On appeal from a motion to suppress we are bound by the trial judge's findings of historical fact unless 'plainly wrong' or without evidence to support them, McGee v. Commonwealth, 25 Va. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*), but we review *de novo* the trial judge's application of defined legal standards such as whether Bellamy waived his Sixth Amendment right to counsel. Id.; United States v. Meglar, 139 F.3d 1005, 1008 (4th Cir. 1998).

---

[1]The Commonwealth argues that Bellamy's brief contains no authorities or case decisions supporting his claim of a Fifth Amendment violation and argues we should summarily reject his challenge. We note that the brief is poorly written. It contains a table of citations that lists the three constitutional amendments at issue and three cases. The argument portion of the brief contains two pages of prose discussing the claimed violations of the Fifth and Sixth Amendments. The only case authority referenced in the argument portion of the brief is Massiah v. United States, 377 U.S. 201 (1964). Despite these shortcomings, the brief minimally satisfies Rule 5A:20. Therefore, we decline to summarily reject the brief, but we do not address the Fifth Amendment issue because the Sixth Amendment claim is dispositive.

"The right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments is indispensable to the fair administration of our adversarial system of criminal justice." Maine v. Moulton, 474 U.S. 159, 168 (1985). The United States Supreme Court recently reiterated the parameters of the Sixth Amendment right to counsel:

> The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398 (1977) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)). We have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964); cf. Patterson [v. Illinois, 487 U.S. 285 (1988)] (holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).

Fellers v. United States, 540 U.S. 519, 523-24 (2004).

The Supreme Court's holding in Moulton is also instructive:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever - by luck or happenstance - the State obtains incriminating statements from the accused after the right to counsel has attached. However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.

474 U.S. at 176 (citation omitted).

It is uncontested that when Officer Campbell obtained Bellamy's statements, the Commonwealth had initiated judicial proceedings against Bellamy and Bellamy was represented

- 8 -

by an attorney. Despite the Commonwealth's arguments to the contrary, the record clearly establishes that the officers deliberately elicited Bellamy's statements by sending Officer Campbell to question Bellamy about his case while she was wearing a recording device. If wearing such a device designed to surreptitiously record Bellamy's responses to Officer Campbell's questions were not enough to satisfy the deliberate elicitation standard, the Commonwealth's own evidence was sufficient to prove the point. When asked what Officer Campbell's goal was during this interview, the officer in charge of the operation testified simply, "her role was to see what he would say about his case."

Although Bellamy had a right to the assistance of an attorney at the interrogation that occurred August 19, he ended the interview by telling the officers he did not want to continue the conversation. He did not say he wanted an attorney; thus, he "at no time sought to exercise his right to have counsel present." Patterson, 487 U.S. at 291. Neither the Fifth Amendment nor the Sixth Amendment bars an accused from knowingly and intelligently "making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone." Id. Thus, the issue in this case under the Sixth Amendment is the same as in Patterson: whether questioning Bellamy at the hospital "without counsel present violated the Sixth Amendment [or did] he . . . validly waive his right to have counsel present during the interviews." 487 U.S. at 292.

A valid waiver is "'an intentional relinquishment or abandonment of a known right or privilege.'" Patterson, 487 U.S. at 292 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). To meet this test, the evidence must establish the accused had "'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Patterson, 487 U.S. at 292 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Moreover, the Commonwealth has the burden to "prove waiver of the right to counsel by clear, precise and

unequivocal evidence." Lemke v. Commonwealth, 218 Va. 870, 873, 241 S.E.2d 789, 791 (1978).  This is so because "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . we 'do not presume acquiescence in the loss of fundamental rights.'" Zerbst, 304 U.S. at 464 (citations omitted).

The Commonwealth has not met that burden in this case.  Although it is well settled that proper Miranda warnings sufficiently provide an accused with "the sum and substance" of the protections the Sixth Amendment provides, Patterson, 487 U.S. at 293, the record in this case is simply devoid of the words that were used to apprise Bellamy of his Sixth Amendment rights and it contains no indication that Bellamy expressly waived those rights.  The record establishes, however, that Officer Campbell did not read Bellamy Miranda rights the day prior to the recorded conversation.  In addition, the transcription of Officer Campbell's conversation with Bellamy discloses a far different version of the Miranda reference than her testimony.  Although both Officer Campbell and Officer Uzdanovics testified that Officer Campbell advised Bellamy of his Miranda rights when she walked into his hospital room with a hidden recording device, the record reveals she discussed Miranda in a frivolous manner.  Even if the inaudible pause contained further comments or warnings about Miranda, neither Officer Campbell's testimony nor the transcript discloses what words she used.  Moreover, neither officer testified that Bellamy expressly waived his Miranda rights and the transcription does not establish that Bellamy did.  "Presuming waiver from a silent record is impermissible. The record must show that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." Carnley v. Cochran, 369 U.S. 506, 516 (1962).

The record shows instead that the police officers obtained Bellamy's statements at the hospital through deception and duplicity and that Bellamy was never aware that the purpose of the casual conversation was to gather evidence for use against him at trial.  A comparison to the

waiver in Patterson illustrates the Commonwealth's failure to prove a valid waiver in this case.

In Patterson, the police officer gave the accused "a Miranda waiver form . . . contain[ing] five specific warnings, as suggested by [the] Miranda decision." Patterson, 487 U.S. at 288. In addition, the officer read the warnings aloud, while the accused read along with him. The accused then initialed each of the five warnings. Later the same day, accompanied by the state's attorney, police officers again interviewed the accused and went through the same procedure. Id. at 288-89. The accused confirmed that he understood his rights, and again he signed the waiver. Id. at 289. While the focus is not on any particular procedure necessary to apprise an accused of his Sixth Amendment rights, Patterson demonstrates the level of communication required to show what constitutes a knowing and intelligent waiver.

That standard was not met here, and we cannot imply waiver by conduct. By simply acquiescing to a conversation, Bellamy did not "intentionally relinquish or abandon" his fundamental constitutional right to counsel. See Edwards v. Arizona, 451 U.S. 477, 485 (1981). As the Court explained,

> To establish a waiver of the Sixth Amendment right to counsel, it is therefore not enough for the State to point to conduct -- such as the initiation of a conversation -- that demonstrates that the defendant's statements were made voluntarily. Since a Sixth Amendment violation does not depend upon coercion, the protection of the Sixth Amendment is not waived by conduct that shows only that a defendant's statements were not coerced. The State must show that the defendant intelligently and knowingly relinquished his right not to be questioned in the absence of counsel. The State can establish a waiver only by proving "an intentional relinquishment or abandonment" of the right to have counsel present.

Id. (citations omitted).

More fundamentally, Bellamy did not make the decision to speak with police with full awareness of the consequences. Officer Campbell's oblique reference to Miranda manifestly established that she obtained Bellamy's statements through deception and duplicity—not through

any conscious choice on his part. Bellamy was not aware that his statements were being recorded, and he was certainly not aware that the police officer's purpose in conversing with him that night was to gather evidence to facilitate the case against him. Indeed, Officer Campbell frivolously suggested to Bellamy that giving Miranda warnings was simply a formality to avoid trouble with her superiors and that no one would know whether or not she read them. Specifically, she said:

> Campbell: . . . I got bitched out because of you.
>
> Bellamy: From who?
>
> Campbell: No, I got in trouble because we were talking last night and I was being all personal with you.
>
> Bellamy: Who told them that we were being personal?
>
> Campbell: I don't know. I didn't read you Miranda. It's like, who cares?
>
> Bellamy: Nobody do.
>
> Campbell: Who knows?

Apparently, the Commonwealth relies upon this deception or in the pause following this deception to suggest that Officer Campbell gave Miranda warnings. This deception negates the possibility Bellamy waived his right with full knowledge of the consequences. To hold otherwise would condone a practice of denying a defendant's constitutional right through the use of fraud and deceit.

We hold that the police deliberately elicited Bellamy's statements in violation of his Sixth Amendment right to counsel and that the trial judge erred in admitting them in the Commonwealth's case-in-chief. For these reasons, we reverse Bellamy's conviction and remand for a new trial.

Reversed and remanded.