COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Causey and White
Argued at Alexandria, Virginia


DEVLON CREW-HAMILTON, SOMETIMES
 KNOWN AS DEVLON CREW HAMILTON

v.      Record No. 0770-24-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE KIMBERLEY SLAYTON WHITE
JANUARY 6, 2026


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Carroll A. Weimer, Jr., Judge

Erin T. Ford for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A Prince William County jury convicted Devlon Crew Hamilton[1] of second-degree

murder and use of a firearm in the commission of murder.  Crew Hamilton then later entered a

conditional guilty plea to possession of a firearm by a non-violent felon, and his convictions

were consolidated for sentencing.  Crew Hamilton contends that the trial court erred by denying

his pre-trial motions to suppress statements he made to the police.  For the following reasons, we

find no error in the trial court's rulings and affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Appellant is referred to in the trial record as both Devlon Crew Hamilton and Devlon
Crew-Hamilton.  We refer to him as the name he used in his notice of appeal filed with this
Court.

BACKGROUND[2]

On May 15, 2022, Prince William County Police Officer Matthew Lanman responded to a shooting on Tavern Way in Woodbridge. Upon arrival, Officer Lanman observed a deceased male, later identified as Miles Tracey Hall[3] "laying in a pool of blood" in the parking lot. Hall was bleeding out of his ears and nose and appeared to be suffering from a gunshot wound to his face. Officer Lanman checked Hall's pulse and then retrieved a trauma kit and started CPR. Medics soon arrived on scene, but by that time Hall no longer had a pulse. He was pronounced dead at the scene.

Assistant Chief Medical Examiner Carmen Coles performed Hall's autopsy. Dr. Coles confirmed that Hall died from a single gunshot wound to the head. The bullet entered through the "lower outer area" of Hall's left eye, fractured his cheekbone, traveled through his brain, and exited "out the back of the head." Dr. Coles did not find any soot or gunpowder stippling around the entrance wound to suggest that the gun was fired at close range.

Crew Hamilton became a suspect after law enforcement learned that he had previously dated Hall's daughter, Ciera, who had passed away in a car accident approximately two weeks before the murder. Hall had created a Cash App account to raise funds for Ciera's children and to help with funeral expenses. However, Crew Hamilton argued with Hall over the account's funds because he believed that Hall had kept the money for himself.

Prince William County Police Detective Andres Sanz-Guerrero interviewed Crew Hamilton on May 27, 2022, in Washington, D.C. Detective Sanz-Guerrero introduced himself to

---

[2] Under the applicable standard of review, this Court views the evidence in the light most favorable to the Commonwealth, as the prevailing party below. *See, e.g.*, *Hill v. Commonwealth*, 297 Va. 804, 808 (2019); *Otey v. Commonwealth*, 71 Va. App. 792, 795 (2020).

[3] Hall's wife testified at trial that he also went by the names "Tracey, Tree or Treetop."

Crew Hamilton and explained that he intended to record their interview before advising him of his *Miranda*[4] rights from a police department-issued *Miranda* card. The card provided:

> You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to consult with a lawyer before answering any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be provided for you, free of cost if you want one. Do you understand your rights as I have explained them?

After Detective Sanz-Guerrero read the card aloud, Crew Hamilton responded that he understood. Detective Sanz-Guerrero told Crew Hamilton that he was there to talk about the homicide and events leading up to it.[5]

Prince William County Police Detectives Israel Perla and Daniel Sekely interviewed Crew Hamilton in Virginia a few days later, on June 1, 2022. Before questioning, the detectives provided Crew Hamilton a bottle of water and allowed him to use the restroom. At the time of the interview, Crew Hamilton was 31 years old and told the detectives that he was on probation in Las Vegas and had spent time in jails in Arlington and Washington, D.C.

Detective Perla read Crew Hamilton his *Miranda* rights from a card nearly identical to the one Detective Sanz-Guerrero used on May 27. At the end of the advisement, however, he added, "Are you willing to talk with detectives without consulting a lawyer or having a lawyer present with you?" While Detective Perla read the advisement card, Crew Hamilton "was across the table looking at [Detective Perla] and acknowledging the questions." After Detective Perla asked Crew Hamilton if he understood his rights, Crew Hamilton said that he did and added that he was willing to answer questions without talking to an attorney or having an attorney present.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] The record does not contain the recording of Detective Sanz-Guerrero's conversation with Crew Hamilton. Detective Sanz-Guerrero testified at the suppression hearing about reading Crew Hamilton his rights but did not testify to any statements Crew Hamilton made about the incident. Detective Sanz-Guerrero did not testify at trial.

Approximately twenty minutes after Detective Perla advised him of his *Miranda* rights, Crew Hamilton asked, "So my lawyer is going to be at the little magistrate place, huh?" Detective Sekely asked Crew Hamilton, "Do you have one already?," to which Crew Hamilton replied, "No." Detective Sekely clarified, "No, so you can retain your own one if you want to pay for it, or you'll be appointed one, but that's not until your arraignment, which will probably be tomorrow morning." When Crew-Hamilton said, "They sayin' today," Detective Sekely clarified that arraignments were at 8:30 in the morning and that Crew Hamilton would see a magistrate that night for bond. Crew Hamilton then told detectives that he lived in Washington, D.C. and worked at a "daycare for dogs," where he had been employed for about a year.

Detective Perla asked if Crew Hamilton had any questions for them. Crew Hamilton said, "I'm just ready to go see the magistrate, man, so I can go lay back down in the cell. Holler at this lawyer tomorrow. Take it from there." Detective Perla explained how he and Detective Sekely became involved in the investigation and developed Crew Hamilton as a suspect. Detective Perla asked Crew Hamilton whether he knew Ciera and her baby, and Crew Hamilton confirmed that he did.

Crew Hamilton told the detectives that Ciera was his "girl" and that they had been together for "a couple months," during which Crew Hamilton had stepped into a father role to Ciera's three-month old daughter because the biological father was not involved. Crew Hamilton said that he learned about Ciera's death on Facebook "like a day after" it happened. He said that he did not learn about Ciera's death from her family members because they did not have his contact information. He claimed that he had gotten along very well with Ciera's family and her father and that he had never had any issues with them. Moreover, Crew Hamilton did not know Ciera's father's real name but knew him as "Tree" or "Treetop" and had only known him for about a month because Hall had just been released from prison.

- 4 -

Detective Sekely asked Crew Hamilton about the fundraisers people had for Ciera. He acknowledged that Hall had set up a Cash App account to raise money. Crew Hamilton shared the account with others, including his colleagues, to ask for contributions to help with funeral arrangements. He learned about the Cash App account during a phone call with Hall "a couple days" after Ciera's death. During the call, Hall was "fucked up" and "drinking and shit," but Crew Hamilton assured him that they would get through it. Hall then asked him to send money to the Cash App account to help with cremation and other expenses. Crew Hamilton said that he did not send any money to the Cash App account, but his colleagues contributed. He denied knowing how much money had been sent to the Cash App account.

When asked specifically about Hall, Crew Hamilton said they never had any issues and that Hall was "alright." He explained that Hall had been living with him and Ciera. Crew Hamilton moved out of the apartment about a week before Ciera's death. He claimed that he learned of Hall's passing when he saw a story on the news. When asked if he remembered what he was doing the day Hall died, Crew Hamilton said that he was at home at his sister's house "chillin."

After Crew Hamilton had been in the interview room for about an hour, he asked to use the restroom again. The investigators allowed him to do so, and Detective Perla followed him to the restroom. On the way out of the room, Crew Hamilton mentioned that he thought he would see a magistrate but was answering questions. After he returned from the bathroom and answered a few more questions, Crew Hamilton stated, "Alright, I'm ready to go see this magistrate now." Detective Sekely replied, "I get you man, I get you, we're getting there," and Detective Perla noted that it was "a slow process."

Detective Sekely then asked Crew Hamilton if he remembered talking to Hall any time around the time he died, including the day before or the day of his death. Crew Hamilton denied

that they had had contact during that time. He said that the last time they spoke was the phone conversation in which Hall verified that Ciera had died and asked for contributions to the Cash App account. Detective Perla told Crew Hamilton that they knew he was in Woodbridge the day Hall was murdered, and Detective Sekely asked if Crew Hamilton had met with Ciera's family that day to talk about the baby. Crew Hamilton agreed and said the conversation was about the baby and also about sharing Ciera's ashes.

Detective Perla told Crew Hamilton that some of his information aligned with what their investigation revealed, but other aspects did not. Detective Perla added that they knew Crew Hamilton came to visit Ciera's family and "something happened inside." Crew Hamilton denied that anything occurred. Detective Sekely explained to Crew Hamilton that video surveillance captured him and his cousin the night of the murder and described Crew Hamilton's clothing that night as a white t-shirt and gray sweatpants. Crew Hamilton said that he was not wearing gray sweatpants but was wearing black pants. Detective Sekely also told Crew Hamilton that his cell phone records placed him at the scene of the murder at the time of the murder.

Detective Sekely explained to Crew Hamilton that they were not trying to trick him, rather they wanted to get to "the bottom of the story." The detectives wanted his version of events because they knew that he met with Hall that night, had "pulled the trigger," and what they did not know was "why." Detective Sekely further noted that once the conversation ended and Crew Hamilton went before the magistrate, Crew Hamilton's opportunity to "tell [his] side of the story" would end because his lawyer would likely not let him testify at a murder trial given the risks of cross-examination. Detective Sekely said that if there was any part of his story that they needed to know, Crew Hamilton needed to tell them, or they would be left with the information they had from their investigation. Nevertheless, Crew Hamilton continued to deny involvement in the murder.

Crew Hamilton explained that people were upset believing that Hall was taking the money from the Cash App account. Detective Sekely told Crew Hamilton that he did not think "there was a person in the world that wouldn't understand being angry with Treetop for what he did" and expressed that what Hall had done in taking the money meant for Ciera's funeral expenses was "a new level of fucked up."

After about a minute of silence, Crew Hamilton stated, "I'm ready to go, to be honest with you. I'm tired of these cuffs, I'm tired . . . I want to see this magistrate person." Detective Perla replied, "Let me ask you this, alright? What conversation happened here between you and Treetop? Give me a little bit on what transpired there." Crew Hamilton paused and then said, "I don't know." He then said that he was never "hot-headed" and repeatedly stated that he did not know what happened to Hall.

After additional questioning and moments of silence, Crew Hamilton told the detectives, "I'm just ready to go." Detective Sekely told Crew Hamilton he knew that it was "hard to see a path forward from this point." However, the path forward began with them because they were his voice "when it comes to court" since he had never seen a murder defendant testify at trial. Detective Sekely told Crew Hamilton, "This is your only chance" and emphasized that he cared more about getting it right than "throwing somebody in jail."

Detective Perla asked if Crew Hamilton "mean[t] to do it" and Crew Hamilton said that he did not pull the trigger. He continued to deny that he knew anything about what happened that night. Crew Hamilton admitted that he drank "a whole bottle of Hennessey" the day Hall was murdered. Eventually, Detective Sekely told Crew Hamilton there was a difference between not knowing and not wanting to tell them, and "what you mean to say is you don't want to talk about it, which is, that's fine if that's what you choose to do." Crew Hamilton did not respond. Just over ten minutes later, Crew Hamilton said, "I'm just ready to go see the magistrate, and lay

down in my cell." Detective Perla replied, "So you don't want us to give an answer to her mom? You don't want her mom to have closure?" Crew Hamilton did not respond.

The detectives continued speaking with Crew Hamilton, who largely sat and listened without responding. At one point, Detective Sekely told Crew Hamilton, "If the option that you're leaning towards is to not talk anymore and say take me to the magistrate, and we go forward with what we have, that's your decision. I think our case is very strong." Crew Hamilton did not respond or request to be taken to the magistrate. A few minutes later, Crew Hamilton told the detectives to take him to his cell, a request he reiterated a few seconds later. Detective Perla asked, "You don't want to do it for her, man, one last thing?"

Detective Perla asked Crew Hamilton if he felt "sorry" and Crew Hamilton said that he was sorry "that happened to" Hall, but that he could not change the past. Crew Hamilton then said that he did not know why Hall stole the money, did not know why Hall died, and knew nothing about the situation. Later, Crew Hamilton said, "I need a cigarette for this shit" and then he and Detective Sekely shook hands. The detective then told Crew Hamilton that he would help him, but he needed to hear what happened from Crew Hamilton. Crew Hamilton said, "Will you buy me a cigarette first and then I'll say it?" Detective Sekely agreed and left the interview room. He then asked Detective Perla, "So how does this go? I tell y'all what happened, and I still goin' to trial?" Detective Perla replied, "It may get to that point. I can't predict the future, we're just dealing with the now." Detective Perla explained the next steps in the court process.

When Detective Sekely returned, all three men exited the interview room so that Crew Hamilton could smoke. After they returned, Crew Hamilton explained that he had confronted Hall about stealing Ciera's money, and Hall responded, "I paid for everything." Crew Hamilton said that he told Hall that's not what he heard, and then his cousin shot Hall. Detectives Perla and Sekely told Crew Hamilton that his story did not match what they saw on video cameras

from neighborhood homes on the night of the murder, and Crew Hamilton finally admitted that he shot Hall from the passenger seat of his cousin's car. Crew Hamilton said that the gun he used to shoot Hall belonged to his cousin.

Crew Hamilton told the detectives, "It feels kind of good to talk about it though." Crew Hamilton said he never wanted Hall to get hurt. He explained that killing Hall was not the plan and that he wanted to understand why Hall would take Ciera's money, which was causing stress for her mother and sister. Crew Hamilton further explained that all he wanted was an honest answer from Hall about the money, but Hall was "talking that stupid ass shit to me." He then admitted that he shot Hall in the front of his head, but said that he "tried to shoot up, like past him" just to scare Hall. He also agreed that he should have stayed at the scene.

Motion to suppress

Before trial, Crew Hamilton moved to suppress the statements he made to Detectives Perla and Sekely. His motion alleged that Crew Hamilton's waiver of his rights was not knowing, intelligent, or voluntary due to "defects" in Detective Perla's recitation of his *Miranda* rights. The motion also asserted that Crew Hamilton did not understand his right to counsel and that the detectives did not acknowledge his "request to terminate the interview." Crew Hamilton later filed a second motion to suppress that raised the same legal issues, but added information from a psychologist, Dr. Sharon Kelley, regarding Crew Hamilton's reduced mental capacity and inability to understand his rights. The Commonwealth filed written responses objecting to the motions, and the matter was scheduled on the court's docket for a suppression hearing.

Before the hearing, the Commonwealth submitted a copy of the video recording of Crew Hamilton's police interview, which the trial court reviewed in advance. At the hearing, the Commonwealth called as its first witness Detective Sanz-Guerrero, who testified about his interaction with Crew Hamilton in Washington D.C. Detective Sanz-Guerrero read from the

card he had used to advise Crew Hamilton of his rights that day and testified that the speed at which he read the card for the trial court was "[a]pproximately" the same speed at which he read the card to Crew Hamilton. The detective confirmed that Crew Hamilton said he understood his rights.

Detectives Perla and Sekely also both testified about their interview with Crew Hamilton. Detective Perla described the tone of the interview as "pretty calm, surprisingly calm. Normal adult conversation, non-confrontational, voices not being raised on either part. It was a very calm interview." Detective Perla said that during the interview, Crew Hamilton "would get quiet at times" but that he did not "specifically ask[] to stop talking." Detective Perla explained that when a suspect grows silent during the discussion, his response may differ according to the circumstances of the interview. He stated, "[s]ometimes you sit there and just sit in silence with the person . . . or sometimes you continue questioning." Detective Sekely likewise testified that the interview was "calm and cordial" and confirmed that Crew Hamilton never told them he wanted to "cease the interview."

Detective Sekely stated that during moments of silence he also remained silent as an "interview tactic" because "silence is awkward, and people tend to want to fill silence with their own voice if no one else is talking. So it gives somebody the chance to start speaking again." Both detectives testified that Crew Hamilton never said he wanted to speak to a lawyer before continuing to speak to them, and both detectives confirmed that Crew Hamilton took bathroom and cigarette breaks throughout the interview. The detectives also "provided [Crew Hamilton] water and some snacks."

During cross-examination, Detective Perla agreed that Crew Hamilton asked to see the magistrate multiple times over the course of the interview, but that Detective Perla did not terminate the interview at those times. When the prosecutor asked Detective Perla in redirect

why he did not take Crew Hamilton to the magistrate upon request, Detective Perla explained, "Because the interview was ongoing, and we were eventually going to take him to the magistrate after we were completed with the interview." Detective Sekely also confirmed that Crew Hamilton made several requests to see the magistrate or to "go to a cell," but Detective Sekely did not take Crew Hamilton to the magistrate until the interview ended.

Dr. Kelley testified on behalf of Crew Hamilton as an expert in clinical forensic psychology. Dr. Kelley met with Crew Hamilton in the jail to perform a clinical evaluation. Dr. Kelley administered the Wechsler Adult Intelligence Scale,[6] reviewed Crew Hamilton's available mental health records, which included the results from IQ testing performed on Crew Hamilton when he was a child, and she spoke with his grandfather. Dr. Kelley testified that Crew Hamilton's overall score of 64 on the Wechsler Adult Intelligence Scale "place[d] him in the first percentile" and was "very consistent" with his childhood IQ score.

Dr. Kelley then went on to describe Crew Hamilton's specific scores on subcomponents of the test, including processing speed and verbal comprehension. Based on Crew Hamilton's scores, Dr. Kelley testified that he was in the "borderline intellectual functioning range" and explained that "[a]n IQ score of 64 is well within the range of what we would think of for individuals with intellectual disability."

Dr. Kelley observed, however, that "[a] formal diagnosis of an intellectual disability requires some other criteria that we don't think Mr. Crew Hamilton meets. That main other criterion is adaptive functioning," which Dr. Kelley explained was "kind of how well he does managing relationships, managing things like transportation and money." Dr. Kelley said that "if

---

[6] Dr. Kelley testified that the Wechsler Adult Intelligence Scale is "essentially the gold standard for IQ testing in the field" of psychology.

somebody has basic skills in those areas, they wouldn't meet criteria for intellectual disability regardless of what their IQ score is."

Dr. Kelley testified that during her second meeting with Crew Hamilton, she administered additional testing in "word reading" and "sentence comprehension" that she thought was the most relevant to his ability to understand *Miranda* warnings. Crew Hamilton's reading result indicated that he was performing at a fourth-grade level and his sentence comprehension result indicated a seventh-grade level.

Dr. Kelley also performed "*Miranda* rights comprehension instruments testing" and explained how such testing was developed and how it was administered. The first component of the testing was "a paraphrasing measure," in which Dr. Kelley read each statement from the *Miranda* warnings out loud, and after each one, asked Crew Hamilton to paraphrase the right that he had just heard. Dr. Kelley could not score Crew Hamilton on this section of the test because Crew Hamilton "didn't do that task. He didn't paraphrase the rights back to [her] despite multiple efforts to kind of clarify and help him understand what [they] were asking him to do." Dr. Kelley explained that the statements Crew Hamilton provided "were more his kind of general thoughts and reflections about police and being interrogated, but not, you know, literally paraphrasing what those statements were."

The second portion of the *Miranda* comprehension analysis was a test Dr. Kelley described as "a recognition measure" which involved "taking the rights one at a time and now presenting the rights with a series of three specific statements with each right." For each of the statements, the evaluator asked the person, "[D]oes this statement mean the same thing as the right you're seeing here or the right to remain silent, for example, or does this statement mean something different[?]" Crew Hamilton scored "a bit lower than the average score of other adults in the legal system generally who have average IQ's" and "a bit lower than adults in the

legal system who have a similar IQ" to him. However, Crew Hamilton "got at least one recognition item correct for each of the rights, but he . . . made several mistakes . . . ."

Dr. Kelley opined that Crew Hamilton "did not understand that the right to remain silent mean[t] the same thing as you don't have to say anything about what you did" and said that Crew Hamilton "also thought that if you won't talk to the police, that will be used against you in court has the same meaning as anything you say can be used against you in court." However, Dr. Kelley also stated that Crew Hamilton "was able to correctly say" that "anything you say can be used against you in court and what you say might be used to prove you are guilty, have the same meaning." Dr. Kelley therefore concluded that Crew Hamilton was "correctly classifying some of the statements within the same right" even though he was "also incorrectly classifying some of the statements" as well.

The third component of the testing was a test that measured "an examinee's appreciation of the nature of the interrogation," including "that the police are looking for evidence against somebody." The test also assessed the examinee's "appreciation of the right to counsel" and "the nature of the right to remain silent." Crew Hamilton did "well" on that test, scoring "twenty-eight out of thirty possible points on that particular subtest."

The final component was "a basic vocabulary test that just asks individuals to define relevant words that are common in *Miranda* rights." Crew Hamilton "was able to define some of [the words] without an issue, but he definitely struggled on other words." Crew Hamilton scored "slightly lower than most folks in the justice system with average IQ's and slightly lower compared to people with his IQ range or with his verbal IQ range specifically." Crew Hamilton "struggled with words like consult and attorney and questioning and the phrase 'used against.'" However, while Dr. Kelley testified Crew Hamilton "had a lot of trouble with right, just defining

what a right is generally," she also stated, "The right to remain silent is something that he recognizes in some forms but not other forms."

Dr. Kelley opined that, based on all of the testing, Crew Hamilton had "vulnerabilities in his ability to understand what a right is generally just as a concept." With respect to the right to remain silent and the advisement that anything he said could be used against him, Dr. Kelley said that Crew Hamilton's "understanding is there, it's present, it's very basic, but it's not very well formed." When asked if Crew Hamilton's "difficulties . . . with vocabulary, verbal reasoning, [and] sustained attention" "combined with the pace of the administration of the *Miranda* warning, as well as his reading level" would "potentially cause a mismatch between his abilities to process and respond," Dr. Kelley replied, "Yes, absolutely." Dr. Kelley elaborated, "So, having to comprehend language, comprehend language that's being delivered quickly and then think about what that language means and make a decision about it, all of those would be vulnerabilities he's kind of walking into the room with."

Dr. Kelley confirmed that she had reviewed the video of Crew Hamilton's interview and determined that it took about 20 seconds for Detective Perla to read Crew Hamilton his *Miranda* rights, which "came out to about a rate of 260 words per minute." Dr. Kelley said that "benchmarks" "from other published research" indicated that "typical spoken language is about 150 words per minute," and she explained that for a person with average intellectual functioning, the "upper limit" for hearing and understanding would "be around 250 words per minute . . . ."

Defense counsel asked Dr. Kelley, "For someone with this borderline intellectual functioning and a processing speed issue, would you expect comprehension of speech delivered at that pace to be readily understood?" Dr. Kelley replied, "No. No, I would expect those vulnerabilities to kind of magnify comprehension problems." In her view, it "would be difficult to reconcile" the detective's answer to Crew Hamilton's question, "[M]y lawyer will be at the

- 14 -

magistrate place[?]," with the explanation, "[N]o, you can retain your own if you want to pay for it or you'll be appointed one, but that's not until your arraignment which will probably be tomorrow morning." Dr. Kelley explained, "Those would maybe sound like opposites or at least statements that are kind of contradictory or one might—the second statement would maybe be understood as negating the first statement."

Defense counsel asked Dr. Kelley whether, during her conversations with Crew Hamilton, he could "ever spontaneously recall any of the *Miranda* warnings?," to which Dr. Kelley replied, "He could recall the right to remain silent and he knew about the right to counsel. So, he was able to convey something, you know about, 'they told me that I had the right to a lawyer.'" Dr. Kelley testified that during her conversations with Crew Hamilton, he "express[ed] a belief that he had asked for a lawyer" and did not believe he could have ended the interview. Dr. Kelley opined that Crew Hamilton's "understanding was it kind of doesn't matter what you say, the questioning just keeps going. There wasn't anything he could come up with to have said that would have ended the interview."

During cross-examination, Dr. Kelley acknowledged that she knew that Crew Hamilton "had prior police contact before this case" and that it was possible if during that prior contact Crew Hamilton had a lawyer who explained the *Miranda* warnings to him, that could improve his comprehension. Dr. Kelley said that she did not know that another detective had read Crew Hamilton his *Miranda* warnings four days before Detective Perla's recitation.

After hearing argument from both sides, the trial court denied the motion to suppress. The trial court first found that there was no clear and unequivocal invocation of Crew Hamilton's rights to terminate the interview, to remain silent, or to have counsel present. The trial court noted that the waiver issue was "a close call," but highlighted that Crew Hamilton had been advised of his *Miranda* rights and gave an explicit waiver when "he said he understood the rights

- 15 -

and he agreed to talk." The trial court also found that "there were subsequent implicit waivers by him continuing to answer questions and talk."

The trial court noted that Detective Sekely's explanation about Crew Hamilton's right to counsel was not "an attempt to mislead him" and "was a pretty accurate recitation of what happens in the real world, but didn't go to the extent to say you understand that means you don't have to talk to us until after that lawyer gets here if you don't want to." The trial court found that the "accommodation" could have been made, but also noted that "at least at that point in the interview, there's no indication whatsoever that the Defendant doesn't understand or that he has any significant deficit in his mental ability."

The trial court found Crew Hamilton's previous involvement with the criminal justice system was particularly relevant since he was on probation at the time of the offense, had been in jail in another jurisdiction, and was advised of his *Miranda* rights just four days before the interview. The trial court also found that based on the demeanors of the detective as well as of Crew Hamilton, "[t]here was nothing coercive in the conventional sense of the word coercive that went on during the course of this interview." The court expressly found that neither the "long pauses" nor the "ultimate length of the interview" was coercive and described the overall atmosphere during the interview as "friendly and congenial" and "a back and forth between the detectives and the Defendant." The court concluded, "So, based on the totality of the circumstances, I find that there is a preponderance of the evidence that the Defendant did . . . knowingly and intelligently waive his rights, [that] there was no coercion, [and] that the motion to suppress should be denied."

It is from that ruling that Crew Hamilton appeals.

ANALYSIS

Crew Hamilton's sole contention on appeal is that the trial court erred by refusing to suppress the statements he made to Detectives Perla and Sekely. He maintains that the evidence failed to prove he knowingly, intelligently, and voluntarily waived his *Miranda* rights or that his statement was voluntary.[7] We disagree.

"At a hearing on a defendant's motion to suppress a confession, the Commonwealth must prove by a preponderance of the evidence both that the accused knowingly, intelligently and voluntarily waived his *Miranda* rights and that the confession itself was voluntary." *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003). In reviewing a trial court's denial of a motion to suppress, the burden is on the appellant to show that the denial of his motion was reversible error. *McCain v. Commonwealth*, 261 Va. 483, 489-90 (2001). Whether the waiver was knowing and intelligent is a question of fact that "will not be disturbed on appeal unless plainly wrong" or without evidence to support it.[8] *Rodriguez*, 40 Va. App. at 156 (quoting *Harrison v. Commonwealth*, 244 Va. 576, 581 (1992)). On the other hand, whether the confession was

---

[7] Our dissenting colleague asserts a new and different argument on behalf of the appellant. Despite capable defense counsel never arguing to the trial court that appellant invoked his right to an attorney—neither in a written suppression motion nor during the suppression hearing—nor maintaining such a position before this Court—neither in briefing nor during oral argument, the dissent asserts this argument as the grounds for reversing the trial court.

[8] While our dissenting colleague begins by stating the proper deference that must be afforded to a trial court's finding of fact, the dissent ignores that requirement. "An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not. This remains so even when the factfinder *could* have found those facts or drawn those inferences but, exercising its factfinding role, elected not to do so." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). In fact, the dissent accuses the majority of "fail[ing] to properly weigh" the facts presented to the trial court in reaching our affirmance. Again, the dissent ignores that the application of the proper standard of deference "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to *weigh the evidence*, and to draw reasonable inferences from basic facts to ultimate facts." *Yearling v. Commonwealth*, 71 Va. App. 527, 532 (2020) (emphasis added) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

voluntary is "ultimately a legal rather than factual question, but subsidiary factual decisions are entitled to a presumption of correctness." *Id.* (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 487 (1992)).

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Thus, when an individual is taken into custody and subject to police questioning, he must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, [and] that he has the right to the presence of an attorney . . . ." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "After such warnings have been given, . . . the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* In fact, "[e]ven when a suspect has waived his *Miranda* rights, his confession is inadmissible if it was involuntary for other reasons." *Rodriguez*, 40 Va. App. at 155. Thus, "[a]t a hearing on a defendant's motion to suppress a confession, the Commonwealth must prove by a preponderance of the evidence both that the accused knowingly, intelligently and voluntarily waived his *Miranda* rights and that the confession itself was voluntary." *Id.*

## A. Waiver

There are "two distinct dimensions" to a waiver. *Thomas v. Commonwealth*, 82 Va. App. 80, 105 (2024) (en banc) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)). A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Berghuis*, 560 U.S. at 382-83). "Only if the totality of the circumstances surrounding the

interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Tirado v. Commonwealth*, 296 Va. 15, 28 (2018) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The totality of the circumstances includes "the conduct of the police," as well as "the defendant's age, education, language, alienage, experience with police, and whether the defendant stated that he understood his rights as read to him." *Thomas*, 82 Va. App. at 106 (quoting *Tirado*, 296 Va. at. 28-29). "A defendant's prior experience receiving *Miranda* warnings may also bolster the conclusion that a later *Miranda* waiver was made voluntarily." *Id.* at 110.

"Both the right to remain silent and the right to counsel require the suspect to unambiguously invoke them." *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020). Indeed, if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. However, "*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *Midkiff v. Commonwealth*, 250 Va. 262, 267 (1995) (quoting *Lamb v. Commonwealth*, 217 Va. 307, 312 (1976)).

"[A] clear and unambiguous assertion of the right to remain silent or to counsel is necessary before authorities are required to discontinue an interrogation." *Green v. Commonwealth*, 27 Va. App. 646, 653 (1998). "In the context of the right to counsel, '[A]mbiguity arises from the circumstances leading up to the statement, along with the statement itself, rather than the words of the statement alone.'" *Thomas*, 72 Va. App. at 574 (alteration in original) (quoting *Stevens v. Commonwealth*, 57 Va. App. 566, 577 (2011)). "Similarly, in determining whether a suspect unambiguously invoked his right to silence, we consider the substance of the statement as well as the context in which it was made." *Id.*

In this case, the evidence supports the trial court's factual finding that Crew Hamilton waived his *Miranda* rights. At the time of the interview, Crew Hamilton was 31 years old, gainfully employed, and on probation in Las Vegas. He had also spent time in jails in Arlington, Virginia, and Washington, D.C. By all appearances, Crew Hamilton spoke and understood the English language and there was nothing to suggest that he did not reasonably comprehend the questions posed to him during his interrogation. Detective Sanz-Guerrero read Crew Hamilton his *Miranda* warnings just days before his interview with Detectives Perla and Sekely. In addition, before questioning on June 1, 2022, Detective Perla read from a preprinted *Miranda* rights card that was nearly identical to the one used by Detective Sanz-Guerrero.

As Detective Perla read him his rights, Crew Hamilton sat across the table gazing at Perla and appeared to be listening intently. On both days, Crew Hamilton said he understood his rights, and on June 1 he expressly agreed to speak with Detectives Perla and Sekely without a lawyer present. Moreover, the record is devoid of any police misconduct, overreaching, or coercion in obtaining Crew Hamilton's waiver. Although Crew Hamilton said multiple times that he was ready to appear before the magistrate and wanted to return to his cell, he did not, as he contends, affirmatively or unambiguously say that he wanted to cease the interview.

In past cases, we recognized that a "defendant's relatively low intelligence and defective education are factors which should be weighed, along with all surrounding circumstances, in determining whether . . . his confession was voluntary." *Bottenfield v. Commonwealth*, 25 Va. App. 316, 324 (1997) (alteration in original) (quoting *Simpson v. Commonwealth*, 227 Va. 557, 564 (1984)). These factors, however, are not dispositive. *Simpson*, 227 Va. at 564; *see also Goodwin v. Commonwealth*, 3 Va. App. 249, 254-57 (1986). Indeed, "[a]n otherwise valid confession or *Miranda* waiver is not rendered invalid because the defendant has a diminished mental capacity." *Thomas*, 82 Va. App. at 110. "For one thing, we have repeatedly held that persons with diminished

- 20 -

mental capacities may still be capable of voluntarily confessing or waiving their *Miranda* rights." *Id.*

"For another thing, "'while mental condition is surely relevant to an individual's susceptibility to police coercion," [a defendant's] "mental condition, by itself and apart from its relation to official coercion" can never "dispose of the inquiry into constitutional 'voluntariness.'"" *Id.* at 111 (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 227 n.10 (2018)). "That is because '*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.'" *Secret*, 296 Va. at 227 n.10 (quoting *Colorado v. Connelly*, 479 U.S. 157, 170-71 (1986)). Thus, this Court has "rejected challenges to the voluntariness of a confession or of a *Miranda* waiver by people with low IQs when the police did not use coercive tactics to exploit such vulnerabilities." *Thomas*, 82 Va. App. at 111.

The record does not support Crew Hamilton's assertion that he was coerced by his "borderline intellectual functioning" into waiving his *Miranda* rights; nor does the record show that he failed to comprehend them. To the contrary, Crew Hamilton expressly stated that he understood his rights and did not voice any confusion, ask any questions, or request any clarification. The answers he gave during the interview were responsive and appropriate to the questions asked and required no explanation. Furthermore, while Dr. Kelley testified that Crew Hamilton's overall IQ of 64 was within the range for intellectual disability, she also noted that he did not meet the criteria for such a diagnosis due to his level of adaptive functioning.

Dr. Kelley testified that Crew Hamilton performed well on some of the testing measures, which indicated that he understood the nature of police interrogations as well as his appreciation of the right to counsel and the right to remain silent. Crew Hamilton "got at least one recognition item correct for each of the [*Miranda*] rights," could define some of the relevant words "without an

issue," and had a basic understanding of the right to remain silent and the advisement that anything he said could be used against him in court. Dr. Kelley also acknowledged that if Crew Hamilton's previous lawyers had explained the warnings to him, his comprehension of his rights under *Miranda* may have been improved.

We therefore find, under the totality of the circumstances presented here, that Crew Hamilton, despite his intellectual limitations, made "an uncoerced choice" with "the requisite level of comprehension" of his rights to waive those rights and speak with law enforcement. *Moran*, 475 U.S. at 421. The trial court did not err in finding that Crew Hamilton knowingly and intelligently waived his *Miranda* rights.

### B. Free and Voluntary Confession

The test to be applied in determining the voluntariness of a defendant's statement "is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" *Midkiff*, 250 Va. at 268 (quoting *Burket v. Commonwealth*, 248 Va. 610, 611 (1994)). "In determining whether a defendant's will has been overborne, courts look to 'the totality of all the surrounding circumstances,' including the defendant's background and experience and the conduct of the police." *Gray v. Commonwealth*, 233 Va. 313, 324 (1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

"Evidence of coercive police activity 'is a necessary predicate to the finding that a confession is not 'voluntary.'"" *Washington v. Commonwealth*, 43 Va. App. 291, 303 (2004) (quoting *Peterson*, 15 Va. App. at 488). "In other words, 'some level of coercive police activity must occur before a statement or confession can be said to be involuntary.'" *Id.* (quoting *Peterson*, 15 Va. App. at 488). "In considering the conduct of the police, we 'must consider the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or

promises of leniency, and duration and circumstances of the interrogation.'" *Peterson*, 15 Va. App. at 488 (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)).

The record lacks any evidence suggesting that Detectives Perla and Sekely coerced Crew Hamilton into confessing to the murder. Before questioning, Detectives Perla and Sekely gave Crew Hamilton a bottle of water and allowed him to use the bathroom. They then asked if he needed anything. During questioning, the detectives provided Crew Hamilton with snacks, more water, and another bathroom break. Detective Sekely later purchased cigarettes and took Crew Hamilton outside so he could smoke. The officers conducted the interview in a normal, quiet tone of voice, remained calm and cordial throughout, and did not threaten Crew Hamilton or brandish their weapons.

Despite that the interview lasted four hours, much of it covered matters unrelated to the homicide, and the detectives at times listened in silence without interrupting Crew Hamilton, even when they knew he was lying. Although Crew Hamilton himself grew quiet at times, he did not specifically ask to stop talking, even when Detective Perla suggested that he could certainly decline to tell his side of the story. The detectives endured the moments of silence to give Crew Hamilton a "chance to start speaking again." Detective Perla testified that he did not take Crew Hamilton to the magistrate upon request because "the interview was ongoing," and Crew Hamilton did not expressly ask to end it.

The trial court reviewed the tape of the interview and considered testimony at the hearing and ultimately found that Detectives Perla and Sekely did not attempt to mislead Crew Hamilton. There was "no indication whatsoever" that Crew Hamilton did not understand his rights, and the evidence failed to prove he had any significant deficit in his mental ability. The trial court also found that Crew Hamilton had previous involvement with law enforcement and that the interview was conducted in a friendly and cordial manner. These findings are not plainly wrong and support

the legal conclusion that Detectives Perla and Sekely did not coerce Crew Hamilton's voluntary confession.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's denial of Crew Hamilton's suppression motion and affirm his convictions.

*Affirmed.*

Causey, J., dissenting.

Under a deferential standard of review, the facts here do not support a finding that Crew Hamilton's *Miranda* waiver was knowing, intelligent, or voluntary, as he did not understand the complexities of his right to counsel, and the detectives did not acknowledge his seven invocations of that right. *See Rodriguez v. Commonwealth*, 40 Va. App. 144, 156 (2003) (noting whether a *Miranda* waiver was knowing, intelligent, or voluntary is a question of fact that "will not be disturbed on appeal unless plainly wrong"). The trial court found that whether Crew Hamilton waived *Miranda* was a "close call" but ultimately decided that Crew Hamilton's waiver was knowing and intelligent—a decision that was plainly wrong, especially given the facts established by Dr. Kelley. Seven times Crew Hamilton expressed his desire to leave the interrogation room to seek counsel, and the detectives ignored his requests, disregarding Crew Hamilton's Fifth Amendment right against self-incrimination.

*A. Invocation of the right to counsel*

Given Crew Hamilton's (1) diminished intellectual capacity and, (2) the police officer's statement that Crew Hamilton would be appointed a lawyer before the magistrate at his arraignment the following morning, the trial court erred in finding that Mr. Crew Hamilton did not invoke his right to counsel. While the right to counsel must be "unambiguously" invoked, laypeople— especially those with diminished intellectual capacity—must be given the benefit of context when invoking their right to counsel. *Midkiff v. Commonwealth*, 250 Va. 262, 267 (1995) ("*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement . . . as a sign that the suspect desires to cut off questioning." (quoting *Lamb v. Commonwealth*, 217 Va. 307, 312 (1976))); *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020). Here, the trial court considered "the substance of the statement" but failed to consider "the context in which it was made." *Id.* It therefore erroneously denied Crew Hamilton's motion to suppress.

- 25 -

The first invocation of counsel occurred twenty minutes after Detective Perla advised Crew Hamilton of his *Miranda* rights. Crew Hamilton asked, "So my lawyer is going to be at the little magistrate place, huh?" Detective Sekely, the second detective in the room, asked Crew Hamilton, "Do you have one already?" And Crew Hamilton replied, "No." Detective Sekely then said, "No, so you can retain your own one if you want to pay for it, or you'll be appointed one, but that's not until your arraignment, which will probably be tomorrow morning." Detective Sekely clarified that arraignments were at 8:30 a.m.

Thirty minutes later, Detective Perla asked if Crew Hamilton had any questions for them. Crew Hamilton invoked for the second time when he responded, "I'm just ready to go see the magistrate, man, so I can go lay back down in the cell. Holler at this lawyer tomorrow. Take it from there."

After Crew Hamilton had been in the interview room for an hour and a half, Crew Hamilton mentioned that he thought he would see a magistrate but instead was forced to answer questions. After he answered a few more questions, Crew Hamilton invoked for the third time when he stated, "Alright, I'm ready to go see this magistrate now." Detective Sekely ignored his unambiguous invocation, replying, "I get you man, I get you, we're getting there." Detective Perla noted that it was "a slow process."

About fifteen minutes later, Detective Sekely told Crew Hamilton that once he went before the magistrate, Crew Hamilton's opportunity to "tell [his] side of the story" would end because his lawyer would likely not let him testify at a murder trial given the risks of cross-examination. Crew Hamilton stated, "I'm ready to go, to be honest with you. I'm tired of these cuffs, I'm tired . . . I want to see this magistrate person." Detective Perla ignored this fourth invocation of his right to terminate the interview, replying, "Let me ask you this, alright?

What conversation happened here between you and Treetop?  Give me a little bit on what transpired there."  Crew Hamilton paused and then said, "I don't know."

After additional questioning and moments of silence, Crew Hamilton for the fifth time tried to terminate the interview, telling the detectives, "I'm just ready to go."  Detective Sekely told Crew Hamilton he knew that it was "hard to see a path forward from this point," and that, "This is your only chance."

Two hours and twenty minutes into the interrogation, Detective Sekely seemed to acknowledge that Crew Hamilton no longer wanted to speak to the detectives when he said there was a difference between not knowing and not wanting to tell them, and "what you mean to say is you don't want to talk about it, which is, that's fine if that's what you choose to do."  Crew Hamilton did not respond.  Ten minutes later, Crew Hamilton for the sixth time invoked his right to counsel, saying, "I'm just ready to go see the magistrate, and lay down in my cell."  Detective Perla replied, "So you don't want us to give an answer to her mom?  You don't want her mom to have closure?"  Crew Hamilton did not respond.

Fifteen minutes later, Detective Sekely told Crew Hamilton, "If the option that you're leaning towards is to not talk anymore and say take me to the magistrate, and we go forward with what we have, that's your decision.  I think our case is very strong."  Crew Hamilton did not respond.  A few minutes later, Crew Hamilton told the detectives to take him to his cell, a request he reiterated a few seconds later.  This was his seventh and final attempt to end the interrogation until after he had been to see the magistrate.  In response, Detective Perla asked, "You don't want to do it for her, man, one last thing?," disregarding Crew Hamilton's request to end the interrogation.

In uncontradicted evidence presented to the trial court, an expert in clinical forensic psychology, Dr. Kelley, noted that it "would be difficult to reconcile" the detective's answer to

Crew Hamilton's question, "[M]y lawyer will be at the magistrate place[?]," with the explanation, "[N]o, you can retain your own if you want to pay for it, or you'll be appointed one, but that's not until your arraignment which will probably be tomorrow morning." Dr. Kelley explained that for a person with Crew Hamilton's diminished capacity, "Those would maybe sound like opposites or at least statements that are kind of contradictory or one might—the second statement would maybe be understood as negating the first statement."

The majority argues that Crew Hamilton did not "affirmatively or unambiguously" say he wanted to terminate the interrogation. To defend its position, the majority highlights how both detectives denied that Crew Hamilton ever tried to end the interrogation or speak to a lawyer, though both detectives admitted Crew Hamilton asked to see the magistrate multiple times over the course of the interrogation. When asked why he did not take Crew Hamilton to the magistrate upon request, Detective Perla merely explained, "Because the interview was ongoing, and we were eventually going to take him to the magistrate after we were completed with the interview." In relying on Officer Perla's testimony, the majority fails to consider the context in which Crew Hamilton invoked his right to counsel.

Crew Hamilton was questioned by Detectives Perla and Sekely for over four hours, in the middle of the night, before he confessed. Over the course of that long evening, Crew Hamilton invoked his right to counsel a total of seven times. Early on, he was told that he would get a lawyer at his arraignment, in front of the magistrate, in the morning. He then repeatedly asked to see the magistrate, which is again where he was told he would get his lawyer. In response, Crew Hamilton asked to go back to his cell to go to bed, in an effort to wake up and seek counsel at his arraignment the following morning. Crew Hamilton began asking to go back to his cell after officers repeatedly ignored or brushed aside his requests to see the magistrate. In context, Hamilton's seven statements can only be understood as a request for an attorney, or to end the

interview *somehow*. This is different from the many ambiguous-invocation cases where defendants state they "maybe" want a lawyer or "might" call one. Given Crew Hamilton's (1) diminished intellectual capacity and (2) the detective's statement that his lawyer would be at the magistrate, it is unambiguous that each time he asked to see a magistrate or, when that did not yield a result, to go to his cell, Crew Hamilton was asking to see a lawyer—or, at the very least, that the interrogation needed to end until after a lawyer was appointed to him.

Stating that Hamilton's words were ambiguous subjects Crew Hamilton to an unjust quest for some magic words that would trigger an end to his interrogation.[9] He told Detective Perla he wanted to "[h]oller at this lawyer tomorrow." He then restated, forty minutes later, "I'm ready to go see the magistrate now." Detective Sekely responded that, when Crew Hamilton went to see the magistrate, he would not get to "tell [his] side of the story," indicating Detective Sekely understood what Crew Hamilton was asking for: a lawyer to represent his interests. All laypersons, but especially those with diminished mental capacity, cannot be expected to know which words must be uttered to end their interrogation. As with any constitutional right, context is key. This principle has led to a longstanding requirement that courts give context to a defendant's statements. And the context here shows Crew Hamilton asking detectives to end his interview, to go to bed so he can wake up and see the magistrate, who in turn will provide him a lawyer. The record shows that the detectives ignored those requests in a deliberate disregard for the safeguards of Crew Hamilton's Fifth Amendment rights.

---

[9] The majority is, by all intents and purposes, upholding the following finding of the trial court: "The whole issue I think is not whether or not there was . . . a clear and unequivocal invocation of his rights. I find that there was not. That he did not clearly and unequivocally say, 'I want to stop this interview, I want to remain silent' or 'I don't want to talk anymore before I have counsel.'" Even disregarding their intellectual capacities, a layperson like Crew Hamilton, who did not even attend high school, cannot possibly be held to such a high standard when invoking their *Miranda* rights. "Hollar at this lawyer tomorrow" and "I'm done" followed by ten minutes of silence is and should be enough of an invocation to tell police that the interrogation must end.

*B. Waiver*

Combined with Crew Hamilton's seven invocations of counsel, the trial court was also plainly wrong to find a voluntary waiver. The totality of the circumstances show Crew Hamilton did not voluntarily waive his right to counsel. As discussed below, Detectives speed-read the *Miranda* warnings to Crew Hamilton, a man with an IQ of 64. Crew Hamilton's first question about where his lawyer would be demonstrated to detectives an obvious misunderstanding of the right to counsel, and he repeatedly asked to either (1) go to the place where he would be appointed counsel or (2) go to his cell. These factors, combined with the record evidence of Crew Hamilton's inability to comprehend the *Miranda* warning, show that Crew Hamilton did not knowingly, intelligently, or voluntarily waive his right to counsel.

In *Thomas v. Commonwealth*, 82 Va. App. 80, 105 (2024) (en banc), we held that a waiver must be "the product of a free and deliberate choice . . . made with a full awareness of both the nature of the right being abandoned and the *consequences* of the decision to abandon it." (Emphasis added) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010)). The totality of the circumstances to determine knowingness, intelligence, and voluntariness of such a waiver includes "the defendant's age, education, language, alienage, experience with police, and whether the defendant stated that he understood his rights as read to him." *Thomas*, 82 Va. App. at 106 (quoting *Tirado v. Commonwealth*, 296 Va. 15, 29 (2018)).

The record contradicts the majority's contention that "there was nothing to suggest that [Crew Hamilton] did not reasonably comprehend the questions posed to him during his interrogation." *Supra*, at 20. The facts established by the uncontradicted testimony of Dr. Kelley, the sole expert witness at the suppression hearing, show that Crew Hamilton did not make a deliberate choice with full awareness of the consequences of his continuing to speak after each of his seven invocations of his right to counsel.

First, Dr. Kelley testified that Crew Hamilton was in the "borderline intellectual functioning range" with an IQ score of 64 and that "this category of borderline intellectual functioning is basically one tick above having an intellectual disability." During his "word reading" and "sentence comprehension" tests—the "most relevant" test to show his ability to understand *Miranda* warnings—Crew Hamilton performed at a fourth-grade level in reading and a seventh-grade level in sentence comprehension.

As the majority conveniently fails to mention, Dr. Kelley also noted that Crew Hamilton "had a history of special education that started in second grade" and that Crew Hamilton left school "during or after ninth grade." And Dr. Kelley opined that a history of special education could be relevant to Crew Hamilton's "ability to understand this [*Miranda*] language and kind of limited education opportunities would influence that as well."

Second, Dr. Kelley testified that Detective Perla administered the *Miranda* warning at 260 words per minute. The average rate of speed of typical spoken language is 150 words per minute. Per Dr. Kelley, a person with average intellectual functioning can comprehend language with an "upper limit" of 250 words per minute, but with Crew Hamilton—with diminished intellectual capacity—the processing speed is much lower. This led Dr. Kelley to testify that she "would expect those [intellectual] vulnerabilities to kind of magnify comprehension problems." Dr. Kelley was then asked whether Crew Hamilton would understand, given his "processing speed issues," the detective's answer to his question, "So my lawyer will be at the magistrate place, huh?" In response to the question, the detective said, "No. You can retain your own if you want to pay for it or you'll be appointed one, but that's not until your arraignment which will probably be tomorrow morning." Dr. Kelley testified that "with [his] level of cognitive functioning, those two statements would be difficult to reconcile."

Third, after a *Miranda* comprehension test, Dr. Kelley found that Crew Hamilton "struggled with words like consult and attorney." She also noted that he "had a lot of trouble with right, just defining what a right is generally . . . [He] only was able to define right as being correct, not as the idea of a protected privilege that somebody has." Dr. Kelley found that Crew Hamilton scored lower than average on this test among adults in the legal system generally *and* "a bit lower" than those who have a similar IQ to him.

Finally, the majority asserts that Crew Hamilton surely did not fail to comprehend his rights, as he "expressly stated that he understood his rights and did not voice any confusion, ask any questions, or request any clarification." *Supra*, at 21. This assertion is not supported by the record. Crew Hamilton asked the detectives, "So my lawyer is going to be at the little magistrate place, huh?" Detective Sekely asked Crew Hamilton, "Do you have one already?" And Crew Hamilton replied, "No." Detective Sekely then said, "No, so you can retain your own one if you want to pay for it, or you'll be appointed one, but that's not until your arraignment, which will probably be tomorrow morning." Not only is this exchange arguably an invocation of the right to counsel, but suggests a lack of understanding of how the right to counsel works—which was not corrected by the officer. Dr. Kelley testified that Crew Hamilton "express[ed] a belief that he had asked for a lawyer" and, given the detectives' responses to those requests, did not believe he could have ended the interrogation. Dr. Kelley opined that Crew Hamilton's "understanding was it kind of doesn't matter what you say, the questioning just keeps going. There wasn't anything he could come up with to have said that would have ended the interview."

Given that Crew Hamilton struggled to understand his *Miranda* rights, the trial court was plainly wrong, as Crew Hamilton did not have the requisite level of comprehension to conclude he had waived his right to counsel. *See Tirado*, 296 Va. at 28 ("Only if the totality of the circumstances surrounding the interrogation reveals *both* an uncoerced choice *and* the requisite

level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (emphasis added) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986))). The trial court overlooked this important comprehension element, focusing merely on the lack of coercion and Crew Hamilton's past experiences with the justice system.

While true that Crew Hamilton had also spent time in jails in Arlington, Virginia, and Washington, D.C., and Detective Sanz-Guerrero read Crew Hamilton his *Miranda* warnings just days before his interrogation, the totality of the circumstances test disallows any one factor to itself close the inquiry. The facts established, as detailed above, show that Crew Hamilton did not have the capacity to understand the *Miranda* rights read to him. In fact, when asked about the impact of having heard *Miranda* warnings previously on his ability to comprehend them, Dr. Kelley explained there was "no meaningful correlation or relationship between [comprehension and] prior justice system experience." The trial court therefore failed to balance the factors, instead crediting Crew Hamilton's past experiences in the criminal legal system and ignoring his underlying ability to understand the warnings provided to him. Both comprehension *and* a lack of coercion are needed to successfully waive *Miranda*, and neither was met here. *See Tirado*, 296 Va. at 28.

In response, the majority merely notes that this Court has recognized that a "defendant's relatively low intelligence and defective education" are mere factors to be weighed with the totality. *Bottenfield v. Commonwealth*, 25 Va. App. 316, 324 (1997) (quoting *Simpson v. Commonwealth*, 227 Va. 557, 564 (1984)). *See also Thomas*, 82 Va. App. at 110 ("An otherwise valid confession or *Miranda* waiver is not rendered invalid *because* the defendant has a diminished mental capacity." (emphasis added)). In *Thomas*, this Court held that "persons with diminished mental capacities may still be capable of voluntarily confessing or waiving their *Miranda* rights." *Id.* However, here, unlike in *Thomas*, there are several factors that—*coupled with* Crew Hamilton's diminished mental

- 33 -

capacities—show he could not have possibly knowingly, intelligently, and voluntarily waived his *Miranda* rights under a totality of the circumstances. The defendant in *Thomas* had this Miranda warning read to him at a comprehensible speed and did not invoke his desire to seek an attorney. *See id.* at 97-98. And, importantly, there was no indication that Mr. Thomas did not understand his right to counsel, whereas Crew Hamilton asked many questions indicating that he did not understand his rights. *Id.* The court in *Thomas* also relied on the defendant's mother's testimony regarding his general history with special education, whereas Crew Hamilton was assessed by an expert forensic clinical psychologist who observed him and was able to show his specific inabilities to understand his *Miranda* rights during his interrogation. *Id.* The majority fails to contend with this distinction and refuses to properly weigh Crew Hamilton's limited mental capacity, history in special education classes, the speed at which he was read the *Miranda* warning, his seven invocations of counsel, and his inability to comprehend the *Miranda* warning. The trial court even acknowledged that Crew Hamilton's waiver of *Miranda* was a "close call." But ultimately, its decision was plainly wrong given the undisputed facts that Dr. Kelley established. No reasonable factfinder could find, in the context of his specific interrogation, that Crew Hamilton knowingly, intelligently, and voluntarily waived his right to counsel.

Lastly, the majority claims that Crew Hamilton "never argu[ed] to the trial court that appellant invoked his right to an attorney—neither in a written suppression motion *nor during the suppression hearing*—nor maintaining such a position before this Court." (Emphasis added). Inexplicably, the majority omits the following exchange that occurred during the argument over the suppression hearing:

> [The Court:] Do we agree that based on the evidence before the Court, there is no absolute, unequivocal, invocation of the right to counsel?

- 34 -

> [Defense counsel:]  Your Honor, *no*.  There are repeated references to wanting to leave the interrogation room *to get to counsel*.
>
>      . . .
>
> [Defense counsel:]  You know, is his vernacular exactly that which you or I would use?  No, but *is it unambiguous that what he wants to do is leave this interview room and get in touch with a lawyer* as soon as possible.  He believes that to be tomorrow, yes.  That's consistent with his language.  So, *I do not agree that there was no unambiguous indication of counsel.*

(Emphases added).  Additionally, the majority is also mistaken in claiming Hamilton failed to maintain this position before this Court.  In his opening brief, Crew Hamilton reiterated this argument, noting that "Mr. Crew Hamilton attempted, within the limits of his intellectual abilities, to terminate the interview and seek the assistance of a lawyer.  These efforts were thwarted by detectives who wouldn't let him end the interview until they were finished."

Because the majority has put form over substance, failing to protect Crew Hamilton from being compelled to be a witness against himself, I respectfully dissent.